Clarence **MADSEN**, Joseph Anthony Zwierzycki, Joseph D'Ziak, Guy Glenn Ashmore and J. A. Madsen Motor Sales, Inc., Plaintiffs,

v.

**CHRYSLER CORPORATION** and Chrysler Motors Corporation, Defendants.

No. 65 C 1783.

United States District Court
N. D. Illinois, E. D.

Dec. 7, 1966.

Judgment Vacated and Cause Remanded March 9, 1967.

Complaint Dismissed March 16, 1967.

Theodore A. Groenke, Myron M. Cherry, McDermott, Will & Emery, Chicago, Ill., for plaintiffs.

Douglas C. Moir, Edward J. Wendrow, Winston, Strawn, Smith & Patterson, Chicago, Ill., for defendants.

## OPINION

WILL, District Judge.

Plaintiffs, J. A. Madsen Motor Sales, Inc. and its stockholders, Madsen, Zwierzycki, D'Ziak and Ashmore, bring this action, complaining of defendants' decision to terminate the Chrysler, Plymouth and Imperial automobile franchises of Madsen Motor Sales in Wheaton, Illinois. A ninety-day notice of termination for cause was served on the plaintiff corporation on August 31, 1965. Prior to the termination of the ninety-day period, plaintiffs instituted this suit. While the franchises have been theoretically terminated as of November 29, 1965, plaintiffs have continued in the business of selling Chrysler, Plymouth and Imperial automobiles during the pendency of this action, under a separate agreement.

Plaintiffs seek damages and an injunction requiring Chrysler Corporation to maintain the original franchise relationship, basing their claim on several alternative theories. Initially, plaintiffs allege that Chrysler Corporation and Chrysler Motors Corporation have conspired to restrain trade and, individually or in concert, have attempted to monopolize trade and commerce in the sale, service and financing of Chrysler and Plymouth automobiles in the Wheaton and Glen Ellyn, Illinois markets, by determining to open a factory-owned or controlled sales unit in that area, replacing Madsen Motor Sales' Chrysler-Plymouth-Imperial (CPI) dealership in Wheaton and Glen Ellyn Motor Sales, an existing Plymouth dealership in Glen Ellyn operated by one William McKie. Plaintiffs contend that such action will restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, by eliminating the competition now existing between Madsen and McKie and constitutes an attempt to monopolize the business of both Madsen and McKie in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

As an additional ground for the claimed § 1 violation, plaintiffs submit that the termination by Chrysler Corporation is in fact a concerted refusal to deal brought about by an agreement between Chrysler and McKie providing that upon termination of Madsen Motors' franchise, McKie will be the operator of the new Chrysler-constructed CPI dealership planned to replace Madsen and Glen Ellyn, McKie's present dealership. Plaintiffs also contend that the conduct outlined above constitutes a violation of the Illinois Antitrust Act, ch. 38 Ill.Rev.Stat. § 60–1 et seq.

Alternatively, plaintiffs allege that the termination of the Madsen Motors franchise gives rise to a cause of action under the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225, on account of defendants' failure to act "in good faith" with respect to the decision to terminate. Finally, plaintiffs submit that, in any case, defendants had no grounds for termination for cause and, accordingly, the termination constitutes a

breach of their obligations under the contract.

As will appear more fully hereafter, defendants contend that the Madsen Motors franchise was terminated solely on account of the latter's failure to perform its selling obligations under the franchise agreement. While there is no dispute as to Chrysler's planned corporate-owned or controlled new dealership for the Wheaton-Glen Ellyn market, defendants take the position that this issue, and the selection of McKie as the proposed operator of the facility, is unrelated to the legality of the Madsen termination. The issues of injunctive relief and liability (on all counts of the complaint) have been tried to the court and the case is now ready for decision as to these issues.

J. A. Madsen Motor Sales initially acquired the Wheaton CPI franchise in 1953. The business was then operated as a partnership between plaintiffs Madsen and Zwierzycki. Thereafter, in 1958, the business was incorporated and two key employees, D'Ziak and Ashmore, acquired stock in the corporation. In 1957, after the enactment of the Dealers' Day in Court Act, new franchise agreements—one covering Chrysler-Plymouth and one for Imperial—were entered into and, upon incorporation of the business in 1958, the latter agreements were replaced with new franchises, designating the corporation as franchisee.

The Chrysler-Plymouth and Imperial agreements are generally identical. Each provide for a continuing, indefinite term relationship, the dealer maintaining the right to terminate for any reason on 30 days' notice and Chrysler reserving the right to terminate on 90 days' notice in five specific instances. Aside from these specified causes, no general right of termination at will is reserved to the manufacturer. This distinguishes Chrysler Corporation franchise agreements from those of the other major automobile manufacturers. See Macaulay, Changing A Continuing Relationship Between A Large Corporation and Those Who Deal With It: Automobile Manu-

facturers, Their Dealers, and The Legal System, 1965 Wis.Law Rev. 483, 564–65 (No. 3, Summer 1965). While § 2–309 (2) of the Uniform Commercial Code, in force both in Illinois and Michigan, Ill.Rev.Stat.1965, c. 26, § 2–309(2); C.L. 1948, § 440.2309(2) [P.A.1962, No. 174], provides that contracts for indefinite terms are terminable at will, that section—if applicable to franchise agreements—is qualified by the words "unless otherwise agreed." The introductory portion of the dealer agreement refers to the recitation of Chrysler's right to terminate for specific causes in opposition to the dealer's right to terminate at will and specifically points out that the franchise agreement may be terminated by Chrysler only in reliance on one of the specific enumerated causes.

On October 26, 1959, an additional dealer agreement relating to Valiant automobiles was executed by Chrysler and Madsen. Its terms are substantially identical to the Chrysler-Plymouth and Imperial agreements mentioned above. The primary ground for termination for cause stated in the agreements is the dealer's failure to perform any of the undertakings and obligations stated in the operative sections of the agreement concerning sales of automobiles and parts, advertising, record keeping and the like.

The franchised dealer agrees that he will sell energetically in the non-exclusive sales area assigned him in the agreement and, since passage of the Dealers' Day in Court Act, specifically will sell whatever number of new Plymouth (or Chrysler or Imperial) automobiles is needed to fulfill his "Minimum Sales Responsibility" or "MSR". The basis for calculating MSR is then set out in the agreement.

The starting point for the calculation of MSR is the "region" designated by Chrysler in which the dealer operates. In the case of Madsen Motors, this region, while referred to as "Chicago", consists of a 108 county, 3 state area, including northwestern Indiana from Elkhart to the Illinois state line, the northern half of Illinois (north of Pe-

oria) and the eastern half of Iowa (up to Des Moines). There are 227 dealer locations in the region, although not all dealers are CPI franchisees, some handling Plymouth only, others selling Chrysler and Imperial but not Plymouth or lacking the Imperial line. Each dealer is assigned a sales locality generally made up of one or more post office listings. The extent of the sales locality is determined by Chrysler and may vary for each line of automobiles. Certain post office areas are not included in any dealer assignment and are considered "open points".

Periodically, and generally once each quarter, Chrysler calculates its overall regional market penetration attained in each of the past three months for each line of cars, determining, for example, the percentage of Plymouths bought by all purchasers in the region from the total number of automobiles purchased. The number of new car registrations in each dealer's sales locality is then determined and the regional percentage applied. The resulting figure is the dealer's Plymouth MSR. In other words, the dealer agrees that he will sell a sufficient number of automobiles to achieve the same percentage of Plymouth sales versus total new car sales as exists in the region—a percentage which is determined and furnished to the dealer approximately three months after the time for performance has passed. The percentage, of course, represents an averaging of the sales of all Plymouth dealers in the region. All sales, including those outside of the assigned sales locality are included, without regard to whether the purchaser resides in an "open point" or in another dealer's locality.

Since the regional percentage is an average, some dealers will necessarily be above the figure and some below—absent the unlikely situation where all dealers have sold a number of cars which yield identical percentages in each sales locality. The evidence adduced at trial shows that, in actual operation, some 40% of all Chrysler dealers fail to achieve the sales figure imposed by the MSR formula

and thus, are theoretically subject to immediate termination. The implications of the MSR formula, its application by Chrysler and its availability as a ground for termination will be considered in some detail hereafter, first in connection with the background of the Madsen-Chrysler relationship and thereafter with respect to plaintiffs' contention that Chrysler's application of the MSR formula constitutes a breach of contract and a violation of the duty of good faith imposed by the Dealers' Day in Court Act.

The Wheaton CPI dealership purchased by Madsen from a retiring dealer in 1953 consisted of a small building (65′ x 75′) containing a two-car showroom and a repair shop accommodating five vehicles. A used car lot, accommodating 30–35 cars, was located across the street and was also used for new car storage. At the time the dealership was acquired, Chrysler's district manager, who participated in the purchase negotiations, advised Madsen that the facilities would be inadequate if the volume of sales—then approximately 100 cars per year—was increased. By 1955, Madsen had increased volume by approximately 50% over the sales of his predecessor and was required to lease additional outside space for storage.

By 1958, Madsen began considering the possibility of obtaining additional property outside of the downtown business district on Roosevelt Road to be used for used car sales and storage, thus increasing the number of new cars which could be "on hand" and freeing the lots across the street from the dealership for use in connection with customer service. The evidence shows that the extent of the dealer's facilities bears an important relationship to volume of sales, a sufficient inventory of new cars being essential to supply the varying demands of customers without delay and the ability to handle increased service volume being an important factor in covering fixed costs, thereby reducing the amount of overhead which must be allocated to each new car sold, permitting dealing at a lower profit margin and thus also increasing volume.

At this time, however, Madsen was dissuaded from expanding his facilities, in part on the advice of Mansfield, the Chrysler district manager and Conklin, his superior. Both expressed the opinion that at that time the Wheaton market did not justify additional investment in facilities and that it would be more profitable to increase their investment by acquiring a second dealership in another location. In view of the prospect of acquiring a second dealership, Madsen and Zwierzycki took steps to incorporate the Wheaton business, to insulate the operation from liability arising from another business and to give D'Ziak and Ashmore, their two key employees, an interest in the Wheaton operation which they would manage in the event a second dealership was acquired. This change required the approval of Chrysler and, as noted above, new franchise agreements were executed for the corporation.

The papers submitted by the Chrysler regional manager relating to the termination of the franchise agreements with the partnership and execution of new agreements with the corporation summarize Madsen's performance with respect to MSR. They indicate that in 1957, Madsen had achieved only 78% of MSR for Plymouth (−28 cars); 92.6% of MSR for Chrysler (−4 cars) and 160% for Imperial (+6 cars). In the first nine months of 1958, Madsen achieved only 48% of MSR for Plymouth (−52 cars); 63% of MSR for Chrysler (−10 cars) and 71.4% of MSR for Imperial (−2 cars). Notwithstanding the fact that Madsen was therefore theoretically in default of its contract selling obligations, the regional manager reported that the management of this dealership is "capably conducted, as proven by past performance."

During the balance of 1958, the Madsen dealership did improve its MSR performance somewhat, achieving 86% of MSR for Plymouth and exceeding MSR for Imperial by two cars. Chrysler MSR achievement remained at the same 63% level. As of October of 1959, Madsen's MSR performance was 87.1% on Plymouth (−11 cars); 87.5% on Chrysler (−4 cars) and even on Imperial. During this same month, the regional manager recommended Madsen for a Valiant dealership, indicating that the sales, service and management organization were good and stating that "they have done a good job for us in the past." During the last three months of 1959, performance was basically unchanged, Plymouth MSR performance dropping to 84% (−16 cars); Chrysler staying the same at 88% (−5 cars) and Imperial improving to +4 over MSR. MSR performance during 1960 was slightly higher for Plymouth, rising to 97% (−2 cars) at year's end. Chrysler MSR performance dropped somewhat. There is no calculation in the record for 1960 Imperial performance.

Throughout this period, Chrysler personnel were actively attempting to find a second dealership for Madsen and Zwierzycki, showing them various possible locations ranging from Milwaukee, Wisconsin, to Quincy, Illinois, as well as several in the Chicago region. The Chicago regional manager, upon learning that Madsen had visited various dealerships outside of the Chicago region, advised him that he wanted to keep Madsen in his region. By the fall of 1960, arrangements were made to acquire Borman Motor Co., Inc., a CPI dealership in Downers Grove, Illinois. In recommending approval of this acquisition, the Chrysler regional manager again noted that the Wheaton dealership had been operated successfully and profitably since 1953, without reference to the fact that MSR for Plymouth and Chrysler had never been attained.

New franchise agreements for Borman Motors, Inc. were issued by Chrysler, effective February 24, 1961. Thereafter, Madsen and Zwierzycki managed the Downers Grove dealership and attempted to supervise D'Ziak and Ashmore's conduct of the Wheaton dealership, spending part of each day in Wheaton. During 1961 and 1962 the sales of the Wheaton dealership suffered a serious decline, from a total of 166 new cars sold in 1960 to 143 in 1961 and 119 in 1962. The

principal decline in this period was in sales of Chrysler automobiles, the number of sales dropping to 52 and then to 38, and the MSR percentage dropping to 75.4% and then to 48.1%. Plymouth sales also dropped during this period, however Plymouth's overall regional penetration fell even more, resulting in an increase in MSR performance up to 98.5% for 1962. Imperial sales continued at approximately the same level, 2 units over MSR in 1961 and even with MSR in 1962.

In March of 1963, Madsen and Zwierzycki obtained the financial statement for 1962 Wheaton operations and noticed that profit had declined substantially. They then planned to return to Wheaton as soon as possible, selling the Borman Motors facility in Downers Grove and concentrating their efforts solely on the Wheaton dealership. Madsen immediately approached Chrysler's "Chicago West" district manager, Rydberg, for assistance in finding a prospect to buy the Downers Grove outlet. Shortly thereafter Rydberg was transferred to another area and replaced by a new district manager, Drace. Madsen then approached Drace for assistance in selling Downers Grove indicating his plans to return full time to Wheaton.

District managers generally make monthly contacts with each dealer in their assigned area, discussing various advertising and sales programs, obtaining orders for new cars, and reviewing the dealership's sales on Sales Responsibility Review Form, commonly known as a "207". The 207 reports contain the figures comparing the dealer's sales to the total industry registration in his sales locality and indicating his performance vis-à-vis the MSR standard. The district manager usually appended his views as to the major cause of below average sales performance and the corrective action necessary. The information on the forms is discussed with the dealer and the dealer then inserts his comments and signs the form. The evidence shows that these conversations are generally pleasant, friendly chats geared primarily to impressing the dealer with the relationship between meeting MSR and obtaining a substantial profit for the dealer. The other corrective programs, e.g., increase sales force, advertising, phone contacts, etc., are similarly presented with this goal in mind. Thus, for example, while many of Rydberg's 207 reports for 1962 show that he considered incomplete coverage of the sales area specified in the dealer agreement a major cause of below average performance, he generally reviewed the scope of the assigned sales area in the context of recommending increased outside selling activity rather than in the framework of the contract-MSR-termination possibility.

On one occasion, Rydberg's report states that he read a copy of the sales agreement to Ashmore. Rydberg's present recollection of the event is that he read only that portion of the agreement which refers to the dealer's obligation to sell MSR, or at least excerpts from that section. In any case, it is clear that Rydberg did not think it necessary to read the portion of the agreement which states that failure to perform strictly in accordance with the MSR requirement will lead to termination. From Rydberg's overriding concern with outside sales activity and from his testimony that he referred to the text of the dealers agreement to refresh Ashmore's memory that he had a responsibility to Chrysler Corporation to get penetration in his local market of influence, we believe that it is reasonable to conclude that Rydberg's comments were not designed to warn Ashmore that Chrysler adhered to MSR as a contract term, but merely regarded reference to the contract as a further device for spurring the dealer on to greater sales. Although MSR achievement for Chrysler had dropped substantially during 1962, Rydberg apparently never considered it necessary to contact the major stockholders in the firm (i.e., Madsen and Zwierzycki) to point out the failings of the Wheaton dealership.

On or about February 1963, the sales localities specified in Madsen's agreement

were unilaterally amended by Chrysler, deleting a few cities and adding several others and having the net effect of increasing the area assigned to the Wheaton dealership and the basic figure used for calculating its MSR. Rydberg states that he discussed the sales locality amendments with Ashmore, although the amendment to the agreement was never formally executed and a copy of the amendments were never left with the Wheaton dealership. While Chrysler relied on the original sales locality in calculating MSR in connection with obtaining authority to terminate Madsen, the MSR records used to provide the district managers with data to work up the 207 reports were adjusted to reflect the amendment made in 1963. Thus, while Madsen's 1963 MSR achievement as per the dealer agreement was 77.7%, 49.3% and 68.7% for Plymouth, Chrysler and Imperial, the comparable figures as computed on the basis of the widened territory were 59.8%, 42.2% and 64.7%. These latter figures were received by Drace, and in assessing the emphasis placed upon MSR achievement by Chrysler personnel, the lower figures must be employed.

Before considering Drace's relationship with Madsen during 1963–65, the relationship between the number of sales and the MSR percentage requires some further amplification. While Madsen's MSR achievement percentages dropped substantially in 1963, its total volume of sales increased by 2, the same number of Chryslers, 3 more Plymouths and 1 less Imperial than in the previous year. The change in MSR can be explained in part by the fact that the Regional Average Market Penetration (i.e., the percentage applied to total sales locality registrations to determine MSR) increased, thus requiring Madsen to sell even more cars to keep pace. Such an explanation, however, is an extreme oversimplification of the factors which give rise to MSR. For example, the Imperial regional penetration rose only .01% in 1963. Madsen's MSR, however, increased from 13 to 16 and his performance went from –1 unit

(92.3%) to –5 units (68.7%). Even under the original sales locality designations, the Madsen sales area for Imperial is substantially larger than for Chrysler, and the latter almost double the area used for Plymouth. Comparing the total number of car purchases in 1962 with 1963, purchases in the Plymouth area increased by only 8.5%. In the Chrysler locality, the increase in total car purchases was only slightly higher: 8.99%. When the additional territory covered by the Imperial designation is added, the overall increase in new car purchases rises to 13%, indicating that purchases in the area not covered by the Chrysler and Plymouth designations increased substantially more. The calculation of MSR assumes that each additional purchaser in the Imperial-only territory is as receptive to the purchase of a luxury automobile as persons in areas with a lower growth rate. Clearly, this assumption ignores the possibility that such a high growth rate in a specific area may involve persons whose automobile preferences are somewhat different than those of a wide cross-section of the population running from Elkhart, Indiana to Des Moines, Iowa. In calculating MSR, however, defendant apparently expects its dealer to sell 2 out of every 100 new car buyers an Imperial automobile and if new car purchases increase by 100 on account of the opening of medium-cost housing for factory workers in the area, the dealer is expected to sell at least 2 Imperials to factory workers (or, more accurately, to any purchaser to compensate for the presence of the factory workers).

In short, to the extent that any of the factors which go into determining the overall number of new cars sold and the number of new cars sold by a Chrysler dealer deviate from the regional average, a dealer may be under or over MSR while still performing adequately under the circumstances. While the dealer's agreement provides that Chrysler will make adjustments in the MSR calculation to incorporate factors affecting a particular dealer's sales opportunities, such adjustments were never made for Mad-

sen, nor is there any suggestion that Chrysler follows a practice of making such adjustments among its dealers. The "adjustment", as it were, appears to be in the conduct of Chrysler personnel, treating below-MSR performance as below expectations but not necessarily as unsatisfactory performance of the dealer's obligations, in the sense that it gives rise to the imminence of termination.

■ As we shall note subsequently in somewhat greater detail, Chrysler can properly waive "strict performance" of the MSR requirement and substitute a standard of conduct which accepts a lesser degree of performance as satisfactory. Having done so, however, it cannot claim the right to vary the standard of satisfactory performance between dealers so as to gain the right to terminate dealers for causes other than those enumerated in the contract, i. e., applying a more rigorous standard of satisfactory performance to one dealer because it has reasons for desiring termination, when those reasons, in and of themselves, would not constitute cause for termination under the contract. Such action is tantamount to rewriting the contract to give Chrysler the right to terminate at will which the contract—as written—precludes.

On May 23, 1963, just prior to Drace's assumption of the district manager position for the Chicago West area, the service facilities at Madsen's Wheaton dealership were visited by C. J. Hoffman, a Chrysler Service Representative. Hoffman's report stated that the service department was too small for Madsen's volume of service. A similar report had been made in January, 1962.

Drace reviewed sales at the Wheaton dealership with Ashmore on September 13, 1963. He noted that sales power and advertising were causes of below average performance but also wrote in "Dealer has done both things that we felt was major cause of below average sales performance." The next month, on October 25, Drace reviewed performance for the first six months of 1963 with Zwierzycki.

The figures show that (based upon the revised sales localities) MSR achievement had gone up for Imperial, but had declined as to both Plymouth and Chrysler as compared to the first five months of the year. Drace did not, however ascribe the deficiency to any major cause, but rather indicated that enlarged service and sales facilities were desirable corrective measures.

In the spring of 1963 Madsen learned that the neighboring Ford dealer had decided to construct a new facility away from downtown Wheaton, on Roosevelt Road. He had engaged in some preliminary discussions with the owner of the adjacent property with an eye toward expanding his facilities by leasing the additional showroom and added service space. Negotiations for a lease were begun in September and, following Drace's recommendation of October 25, 1963, regarding the need to expand sales and service facilities, Madsen had the lessor prepare a proposed lease for the additional space. The "dealer's comments" section of the 207 report of October 25 reflects this intention, indicating that dealer will have facilities enlarged within 3–4 months. This report was also initialed by Chrysler's assistant regional manager and a member of the regional marketing staff.

On December 10, 1963, the Madsen dealership was visited by Hoffman, the service representative, who outlined various suggestions for improving the existing service department prior to the expansion. His report indicates that future contact should concentrate on assisting the dealer in his expansion. Three days later, Hoffman and Drace held a joint meeting with Madsen. Drace's report states that he covered the lost sales report and "what effect expansion program would have on this condition", indicating that Madsen felt that within six months their sales would increase by 50%. Drace's report continues by saying that based on Madsen's plans he "recommends" that Chrysler give the dealership a chance to show that they are moving in the right direction and recom-

mends that Madsen take on the extra building. Drace's testimony as to the conversation on December 13, however, does not support the conclusion that the conversation was geared to any "you are in jeopardy because of low MSR but we will give you a chance" approach. Rather, the whole tone of the meeting appears to have been optimistic. Hoffman prepared a building layout for Madsen to use in the expansion and, on deposition, Drace testified that he "approved" Madsen's signing of the lease.

The lease for the new facilities was signed on December 18. On December 26, another meeting with Madsen, Zwierzycki, D'Ziak and Ashmore was conducted by Drace, together with Chrysler's "Dealer Placement Specialist", R. R. Fisher. Fisher states that he was requested to make this contact because it was "understood" that Madsen was contemplating an addition and "because of their below minimum sales responsibility we wanted to take a look at the future of the dealership." The conduct of the meeting, however, again belies the witness' claim that the conversation focused on the consequences of failing to achieve MSR or that the future of the dealership was in question. Drace states that neither he nor Fisher suggested that Madsen might be terminated because of its MSR performance and while he recalls that Fisher advised Madsen that unspecified "other steps" might be taken if sales did not improve, Fisher's own report makes no reference to this sort of a warning.

The evidence shows that the emphasis of the December 26 meeting was geared to the fact that Madsen's expansion would increase his overhead and thus require more sales to obtain a profit. The goal of achieving or exceeding MSR was apparently treated more as a guide to profit than as a prerequisite to retaining the franchise.

Contacts between Chrysler personnel and Madsen during the first two months of 1964 focused largely on the details of the expansion and the operation of the service department to cover a greater percentage of the overhead, thus making it possible to sell new cars at lower prices. In January, 1964, Drace also located a prospect for the purchase of the Downers Grove dealership, in accordance with Madsen's plan to return to Wheaton exclusively and devote all of his energies to that dealership. The prospect, John Hume, submitted his application for a franchise to Chrysler on March 10, 1964.

In early March, Drace reviewed the Wheaton dealership's 1963 performance with Madsen. Drace's figures, based on the enlarged sales territory, showed MSR achievement of 59% for Plymouth, 42% for Chrysler and 64% for Imperial. Drace noted, however, that the dealer had taken all the corrective action regarding sales force and facilities needed to do a volume sales job and pointed out that Madsen's sales in January, February and March of 1964 were more than 100% greater than the same period in 1963.

If the MSR achievement figures for the Wheaton dealership are calculated on the basis of the sales localities specified in the dealer agreement, they are substantially higher than those used by Drace, rising to 78% for Plymouth, 50% for Chrysler and 74% for Imperial. The records used by Chrysler also show 4 less sales in 1963 than Madsen's books, a fact that was noted by Drace on the 207 report. If Madsen's figures were used the percentages would have been slightly higher in each case. About the same time Drace advised Madsen that Chrysler had refused to rewrite the dealership agreement to show that D'Ziak and Ashmore had increased their ownership percentage to 24% thereby qualifying them for Chrysler's dealer insurance program. Drace explained Chrysler's decision on account of the dealership's "lost sales condition". He did not, however, suggest that the "lost sales condition" was such as to put the entire franchise in jeopardy.

When Madsen's 1963 MSR performance is compared to those of other dealers in the Chicago West district, his comparative position places him in the middle of the group. Thus, for Plymouth, eight

dealers were below Madsen's 78% and six exceeded that performance. For Chrysler, four were below Madsen and ten above. For Imperial, six dealers ranked below Madsen and only three above him. Moreover, in the case of two of the dealerships ranking above Madsen in all lines, it should be noted that their MSR achievement—ranging from 244% to 600% is not necessarily an accurate description of comparative performance. In both instances, the dealerships are in comparatively small communities and, while the record does not reveal the exact description of their sales localities and its relation to the area actually covered, the continued performance of these dealerships at levels double or triple MSR (and even higher) suggests that they are the beneficiaries of sales locality designations which exclude portions of the areas in which they actually sell. Moreover, in dealing with small outlets, performance 600% in excess of MSR may in fact involve relatively few additional sales. The relationship between actual sales area and sales localities used for the MSR calculation is of particular significance inasmuch as all regional sales go into calculating the regional penetration figure upon which MSR is based. Thus, dealers whose sales localities have been narrowly drawn may appear to be performing well above the MSR standard and yet—in terms of the sales lost to dealers of competing makes —be performing no better (and possibly worse) than a dealer who is under MSR, but whose contract sales locality covers all of the territory in which he generally makes sales. Conversely, when considering sales localities in suburban areas, the designation of several "post offices" as one dealer's sales locality may not be an accurate description of the buying habits of the population. In general, purchasers may gravitate toward larger dealers in the city proper or to dealers in nearby suburban communities who, by reason of their size, volume or other factors are in a better position to deal at lower prices. In particular, several of the farther out communities desig-nated in Madsen's sales locality have other dealers whose locations are equally convenient. Again, the suburban dealer may be effectively representing the manufacturer in his community although remaining below the MSR standard.

The entire question of MSR as a standard of performance must also be considered in light of the trend toward large "clusters" of competing automobile dealerships and the construction of large, modern sales facilities in these areas designed to draw prospective purchasers from a wide area. This type of construction often requires more capital than a private dealer is able to supply— or risk. Thus, automobile manufacturers have developed plans to assist in the construction and operation of these facilities. In some instances, the facilities are constructed by the manufacturer and leased to a private dealer. In others, manufacturer participation is more pronounced, as exemplified by Chrysler's "Dealer Enterprise" Division (DE). DE generally employs one of three alternate plans in establishing new, modern facilities beyond the means of private dealers. The first, or regular plan, involves 25% participation by the private dealer, Chrysler obtaining preferred stock for its 75% contribution. In the second, or contractual method, the dealership begins as a wholly-owned subsidiary of Chrysler, the individual dealer being hired as President and General Manager of the DE outlet.

In both the regular and contractual plans, the private dealer, if successful, uses a portion of his profits to obtain a greater share (and eventually control) of the DE corporation, through purchase and retirement of the preferred shares held by Chrysler or, if Chrysler has provided all of the capital for the dealership, by accumulating profits until he is in a position to make a 25% investment and become a "regular" DE dealer. Where the dealership has incurred substantial losses, Chrysler will often make a capital contribution to the dealership to put it back on its feet. As a final

alternative, DE will operate an agency as a wholly-owned corporate facility.

By giving the dealer the use of Chrysler's funds (in whole or in part) and by restricting his obligation to purchase any of the manufacturer's interest to only those situations where the dealership has shown a profit for the year, the DE system effects a substantial reduction in the risks which the dealer takes. As a result, the dealer's primary concern becomes synonymous with that of the manufacturer: selling more cars. He is under less pressure to sell each car at a satisfactory profit. The record shows that DE dealerships have often operated at an overall loss for substantial periods of time and, when profitable, their profit per new car sold is substantially lower than that of private dealers. The DE outlet is also equipped to handle a large volume of service, thus adding an additional factor enabling the dealer to forego profit in the sale of new cars. In short, the DE dealerships are designed to obtain volume and to increase the manufacturer's share of the market beyond that which even an aggressive private dealer can obtain. By dealing in the manner described above, the DE dealership also has a wider territorial impact, selling cars well outside of its immediate sales area.

The volume sales made by DE dealers thus help increase the regional market penetration figure which is then applied to registrations in each dealer's designated sales locality to arrive at the dealer's MSR. In order to reach MSR, the private dealer must therefore sell at a volume comparable to the Chrysler-financed DE dealer. Moreover, to the extent that the DE outlet makes its influence felt in the private dealer's sales area, the private dealer's problems in meeting MSR are compounded.

Some time in 1964, Chrysler determined that it could obtain greater volume —and hence a greater share of the market—in Wheaton and its adjoining community of Glen Ellyn if it could construct one large modern CPI sales facility to serve both sales areas. This DE outlet would replace the Madsen CPI franchise in Wheaton and a Plymouth-only franchise (Glen Ellyn Motors) in Glen Ellyn. Chrysler calculated that such an outlet would be able to sell approximately 75% more automobiles than the combined sales of the two smaller dealerships and, in fact, would sell a volume of automobiles substantially above MSR.

On March 23, 1964, F. G. Hazelroth, Chrysler's regional sales manager, and F. H. Eustis, his superior from Detroit, called on the principals of Madsen Motors at their place of business. Madsen was at the Downers Grove dealership at that time and, after examining the facilities in Wheaton including those which were then being remodeled, Hazelroth and Eustis visited Madsen in Downers Grove. At this meeting, Madsen was advised that Chysler's new marketing program contemplated combining Wheaton and Glen Ellyn into one sales area and serving it through a new DE dealership to be constructed in the developing "automobile cluster" on Roosevelt Road. Madsen advised them of the fact that they had taken steps to expand the Wheaton dealership and that he was attempting to sell the Downers Grove outlet to a prospect which Drace, the district manager, had located for him, planning thereafter to devote all of his attention to the operation of the Wheaton dealership. Hazelroth and Eustis then advised him that they had settled on the move to a new outlet on Roosevelt Road and did not believe that Madsen and his partners were the proper persons to operate such a facility. In view of their plans and Madsen's sales record, they asked if Madsen Motors would agree to a "mutual termination". According to Hazelroth's memo as to the meeting, Madsen inquired as to the course of action which would result from his refusal to agree to a termination and he was advised that neither Hazelroth nor Eustis could answer his specific question except to say that the performance in the Wheaton dealership vis-à-vis MSR made him "vulnerable" to a 90-day termination (i. e., for cause). Madsen apparent-

ly expressed some surprise at the prospect of a 90-day termination and Hazelroth informed him that in fact they had issued such a notice to another dealer just recently.

Madsen apparently also indicated sentiments to the effect that if he was not good enough to be the CPI dealer in Wheaton he did not want to be their dealer in Downers Grove also. He was informed, however, that Chrysler was satisfied with his performance in Downers Grove and that they did not seek a termination from him there, except as he should wish it. It was agreed that further discussions regarding Chrysler's desire for a mutual termination would be had in the near future, after Madsen had consulted his associates.

On the day following the meeting with Madsen, Hazelroth submitted a detailed proposal to the director of Chrysler's DE office in Detroit seeking assistance on the project to establish a DE facility for the combined Wheaton-Glen Ellyn area. Hazelroth's proposal states that they believe that neither Madsen nor McKie, the existing dealer in Glen Ellyn, are qualified to operate the new DE facility and, accordingly, they are planning to effect mutual terminations with both dealers. The proposal does not refer to any plan to terminate for cause if a mutual termination cannot be effected. The new DE facility was proposed as a wholly owned corporate outlet.

It is also important to note that at the March 23 meeting, Hazelroth did not present and review the current 207 form showing Madsen's sales performance versus the MSR standard. This failure is subsequently explained in the papers relating to the 90-day termination on the ground that their objective as of March 1964 was to buy out the dealership. Hazelroth's suggestion that Madsen was "vulnerable" to a 90-day termination for substandard sales must be viewed in light of this fact. Apparently, Hazelroth did not consider Madsen's "vulnerability" to be such as would make presentation of the actual calculation of MSR performance appropriate.

On April 6, 1964, Hazelroth met again with Madsen, accompanied this time by Zwierzycki, D'Ziak, and Ashmore. Hazelroth's memorandum, prepared eight days after the meeting, states that he reviewed substandard performance "as we had previously done on March 23" and also advised them that, because the competition was relocating on Roosevelt Road, Chrysler had decided to locate its dealership in this area. According to Hazelroth, Ashmore, Zwierzycki and D'Ziak emphasized the fact that "they had not paid too much attention to their lost sales and had definitely not paid any attention" to the 207 forms. Hazelroth states that he pointed out that they had written their comments on the forms when presented for their signatures.

While it is true that the 207's were presented to one of the partners of the dealership for signature, this fact does not give the 207 forms the overriding importance which Hazelroth ascribes to them and which Chrysler now relies on to show continual enforcement of MSR as a standard of performance under the dealer's agreement. The evidence shows that the review of actual sales versus MSR was rarely, if ever, conducted in terms of the dealer's default on his contractual obligations. In view of the manner in which MSR is computed, and the fact that 40% of the dealers are, almost by necessity, under MSR, such an approach to performance of the dealer's obligation would be understandably ridiculous. The evidence shows that the periodic reviews of sales versus MSR were treated as somewhat of a ritual required in order to satisfy the superiors of the district manager. They were presented in the context of "how can we do a better job and make more profit", the district manager and the dealer then arriving at some statement which could be set down under "dealer's comments" and forwarded to the regional office. Prior to Chrysler's decision to replace Madsen and to obtain his agreement to a mutual termination, the subject of cancellation for below-MSR performance had not been raised, even though the dealership's MSR

achievement percentage had on a number of occasions been substantially lower than it was in 1964.

Subsequent contacts between Hazelroth and Madsen were had on April 13 and April 21. Certain questions as to the terms of a mutual termination for both the Wheaton and Downers Grove dealerships were discussed, Madsen presenting certain information concerning the inventory and assets of both dealerships. A few days following the meeting, Zwierzycki, as president of Borman Motors, Inc. (the Downers Grove outlet), sent Hazelroth a letter authorizing Chrysler to act as their agent in obtaining a buyer for Downers Grove.

During this time, Chrysler had Hume's application for the Downers Grove dealership and had already received (on March 23, 1964) a retail credit report on Hume. Nevertheless, action on Hume's application was deferred, Chrysler's plan being to relocate McKie (the existing Glen Ellyn dealer to be eliminated under the new proposal) in the Downers Grove dealership. Several contacts between Chrysler representatives and McKie were made during April and May, 1964. As of May 28, however, McKie advised that he had reversed his position and was no longer interested in Downers Grove. McKie indicated that he would want to apply for the new Wheaton-Glen Ellyn dealership "when and if it becomes available".

A further contact with Madsen and Zwierzycki was made by Johnson, Chrysler's regional dealer placement manager, on July 28, 1964. Madsen and Zwierzycki advised the Chrysler representative, as they had in the past, that they would not negotiate the subject of the Wheaton dealership unless and until the Downers Grove dealership had been sold. Thereafter, on September 14, Hazelroth wrote Eustis, the head of dealer placement in Detroit who had participated in discussions with Madsen and McKie, requesting a temporary withdrawal of the Wheaton-Glen Ellyn combination project until they could arrive at firm plans regarding the relocation and/or replacement of their existing dealers, Madsen and McKie.

By this time, the plans for combining the Wheaton and Glen Ellyn areas had been given general approval by Chrysler's Dealer Representation Department. Their memorandum indicates agreement that Wheaton and Glen Ellyn are in fact a single market. The memorandum also indicates that Dealer Representation would oppose any situation in which the projected volume of sales for the area would be shared by more than one dealer. This position must be considered in light of the fact that the volume of new car sales estimated for the dealership exceeds the combined MSR for Madsen and McKie. In short, from its analysis of the market, Chrysler's Dealer Representation Department had concluded that the way to obtain a volume of automobile sales commensurate with Chrysler's interests as a manufacturer was to combine the two sales areas so that a dealer would be in a position to sell cars at the lowest possible prices. Even if existing dealers were meeting the MSR standard, the fact that the volume was being divided between them would make such an outcome impossible. Conversely, of course, the reduced potential for high volume places increased pressure on obtaining a high profit per car and makes attaining higher volume difficult.

It is also important to note that while Chrysler had agreed that Wheaton-Glen Ellyn was in fact one market, adjustments reflecting this fact were not made in computing MSR. Where there is more than one dealership in a market, MSR is computed for the whole market and then equitably apportioned among the dealers. Madsen's dealership agreement specified a much larger portion of the Wheaton-Glen Ellyn sales area as his "sales locality" for MSR purposes. Once Chrysler concluded that Madsen and McKie were both selling Plymouths in the same market, it would have been appropriate to divide the MSR between them. In such a case, the share of the combined MSR which would have been assigned to Mc-

Kie would undoubtedly have been larger than the MSR calculation for the narrow area specified as his sales locality. Similarly, Madsen's MSR would have been proportionately reduced, in recognition of the fact that McKie was competing directly for sales of Plymouths in the area.

Two days following the temporary withdrawal of the plans for the new DE dealership, Madsen, Ashmore, Hazelroth and Johnson met at the Chrysler Regional Office. In substance, Chrysler personnel made another attempt to "sell" Madsen and his associates on the idea of negotiating a mutual termination of the Wheaton dealership without waiting until the Downers Grove dealership had been sold. Madsen was also advised that Chrysler was perfectly willing to have him stay on in Downers Grove. Madsen indicated that they had not altered their resolve to give up the Downers Grove dealership so that they could devote all of their energies to Wheaton and that they would not talk about Wheaton until a buyer was found for Downers Grove.

Thereupon, Drace, the district manager, contacted Hume, whose application for the Downers Grove dealership had been pending since March. After substantial negotiations, the agreement selling the Downers Grove dealership to Hume was consummated on December 12, to be effective December 31, 1964.

The record indicates that no further discussions were had with Madsen and his associates regarding the Wheaton dealership or its sales performance vis-à-vis MSR after September, 1964 until January 5, 1965, when Drace presented the 207 form showing performance for the first six months of 1964.

Immediately after the consummation of the Hume-Madsen transaction, Hazelroth requested immediate reactivation of the Wheaton-Glen Ellyn DE project, which recommendation was approved by Eustis and forwarded to the Dealer Enterprise Division.

Madsen's sales following the March 23, 1964 meeting at which Chrysler's request for termination was discussed and the possibility of a forced termination suggested did not continue at the same 100%-over-1963 rate that had been achieved during the first three months of 1964. At the end of the first six months, Madsen's performance for Plymouth was 85% of MSR, as compared with 95% for the first three months. The figure for Chrysler fell from 87% to 64% and Imperial dropped from 70% to 57%. The possibility of termination was clearly a substantial factor in causing this decline. In order to prevent substantial losses in the event that termination did occur, Madsen necessarily restricted the credits given potential buyers for used cars to the wholesale market value, limiting the investment in the vehicles to the amount which could be realized in a forced liquidation. As a result, Madsen was placed at a disadvantage as compared to other dealers who could offer greater trade-in credits on used vehicles.

The figures for the first nine months of 1964 show that the Plymouth percentage returned to 90.4% of MSR, the Chrysler figure remained the same at 64.2% and the Imperial figure dropped slightly to 50%. The year-end figures, which were never presented to Madsen show 80.56% of MSR achieved for Plymouth, 63.92% for Chrysler and 50% for Imperial. Unlike the 9-month figures used above, these figures have not been corrected to conform to the sales localities specified in the dealer agreement. The figures for Chrysler and Imperial would, therefore, be somewhat higher. In any case, the evidence shows that had Madsen been able to maintain the growth rate shown in the first quarter of 1964 throughout the year, its year-end performance would have exceeded MSR for all lines. As it was, Madsen did sell almost 40% more cars in 1964 than in the prior year.

The record strongly supports the inference that absent any disruption of its business, Madsen Motors would have continued to sell at a higher volume during all of 1964 and would have come near to or would have exceeded the MSR standard. In any case, compared to the

other dealers in the Chicago West District, Madsen Motors' performance put it in the middle of the group for Plymouth, just below average for Chrysler (the median dealer achieving 78% of MSR) and toward the bottom of the group for Imperial (although, in the latter case, only five units under MSR). Indeed, Madsen's performance in Wheaton was substantially better than in Downers Grove where Chrysler had indicated that it was happy to have Madsen stay on, the the latter dealership achieving only 39% of MSR for Plymouth (third lowest), 75% for Chrysler and 128% (i. e., one or two units over) for Imperial. Madsen's Wheaton performance was roughly on a par with the Alsip, Illinois DE dealership which achieved 65% of MSR for Plymouth (below Madsen's percentage); 84% for Chrysler (above Madsen); and 50% of Imperial (the same as Madsen). When the figures for the two dealerships consistently surpassing MSR by 300–600% (apparently as a result of narrowly-drawn sales localities) are eliminated from consideration, the balance of the Chicago West district appears to be a relatively homogeneous group more suitable for comparison than the Chicago Region grouping which runs the gamut from large DE outlets in Chicago to small rural dealerships. In the Chicago West grouping, Madsen's performance is no worse than average and, in some cases, is slightly above the median. Of this group only one dealer aside from Madsen Motors has been terminated for substandard sales performance and, as compared to Madsen, that dealer's performance vis-à-vis the MSR standard was characterized by Drace as "substantially worse".

On January 26, 1965, Eustis submitted an addendum to the original proposal for the Wheaton-Glen Ellyn DE project. The addendum indicated that they had now decided to propose McKie, the owner of the Glen Ellyn Plymouth dealership, as the candidate for operator of the Wheaton-Glen Ellyn facility. McKie would agree to a mutual termination of his Glen Ellyn dealership and use the funds there obtained to become a regular (i. e., 25%) investor in the new DE dealership.

Shortly thereafter, Madsen and his associates were contacted by representatives of the Dealer Enterprise division. In substance, the Chrysler representatives were advised by Madsen that they were not interested in negotiating a mutual termination and that they wished to remain as the CPI dealership in Wheaton, if possible, at their present location. Madsen's position was confirmed in a second meeting, this time with Hazelroth and Johnson, on March 2. At this meeting Madsen indicated that he and his associates had discussed the question of relocating to Roosevelt Road and agreed that it would be desirable. They also indicated that they believed that now, with all four men working in one dealership, sales and profits could be substantially increased. Hazelroth and Johnson then reviewed the MSR performance figures for 1963 and the first nine months of 1964, indicating that in view of their performance they did not believe that Madsen and his associates could do the job that Chrysler wanted done on Roosevelt Road. The meeting concluded with Johnson and Hazelroth indicating that they would consider the matter in the regional office and discuss it in detail with Detroit and advise Madsen. Nothing was said in this meeting about the possibility of a forced termination.

Johnson contacted Madsen again on March 12, advising them that in view of their past performance Chrysler would not reconsider its decision to seek a mutual termination. Madsen and his associates again advised Johnson that their position was unchanged from that previously stated at the March 2 meeting. Again, nothing was said about the possibility of termination "for cause".

In between the March 2 and March 12 meetings, Drace presented the 207 form showing Madsen's performance for the first nine months of '64. Under the section headed "major cause of below average sales performance", Drace noted (1) that for the first three months the deal-

ership was in the process of expanding; (2) that during this period it was not advertising at all times; and (3) that prior to expansion it had not been "volume minded as such". In the section headed "corrective action necessary" Drace referred to advertising and the physical setup of the dealership, but did not indicate that Madsen Motors was still not "volume minded".

On March 19, 1965, Hazelroth submitted a request for a 90-day (for cause) termination of Madsen Motors to Chrysler's Detroit office. Hazelroth's request states that while Madsen's attitude toward the manufacturer and the product is generally good, the dealership is "not interested in attaining volume". The request indicated the fact that once Madsen was terminated, its facilities would be taken over by DE, to be operated by Chrysler pending construction of the combined Glen Ellyn-Wheaton DE dealership which McKie had been selected to operate.

The Chrysler Termination Committee approved the 90-day termination for Madsen Motors on June 24, commenting only that "this dealer is not volume minded but is inclined to hold out for the top dollar". On July 15, Chrysler's Dealer Agreement Review Board approved the termination. Notes made by Richard O. McMann, Chrysler's Dealer Representation Manager, contain the following comment: "90 day would provide firm base for discussion with Madsen regarding either relocation or mutual termination". The Review Board "highly suggested" that every effort to secure a mutual termination be made before delivering the 90-day forced termination notice.

While the request for termination was being considered, Madsen and his associates had several meetings with persons from Chrysler's regional office. On June 8, they met with Johnson, the regional dealer placement manager. Madsen advised Johnson that they had requested the meeting to obtain an answer from them as to the future of their dealership, specifically, whether Chrysler was going to attempt to terminate them, allow them to remain in their present facilities or give them the opportunity to relocate in the new facility on Roosevelt Road. Madsen restated their position that they wanted to have the opportunity to relocate in the new corporate facility. Johnson did not advise them that termination was in progress—or even being seriously considered—but told Madsen that every effort would be made to give them a decision as to the future of their dealership in two weeks. A follow-up to the June 8 meeting was held June 24 at Ashmore's residence, Johnson and Drace representing Chrysler. Johnson advised them that as of this time there had been no change in Chrysler's position; that Chrysler still wanted a mutual termination and in response to the question as to what their status was in view of their decision against mutual termination, Johnson advised that they are still, "as of right now", the CPI dealer in Wheaton. Nothing was said about a termination for cause. The only reference to Madsen's sales performance was in connection with the possibility of relocating on Roosevelt Road, i. e., that, in view of Madsen's sales, Chrysler did not feel that they were the men to operate a facility being opened for the purpose of selling at high volume. Johnson did advise Madsen that Chrysler had taken an option on certain property on Roosevelt Road and indicated that the search for a suitable site was going ahead "due to the prime importance of eventually securing facilities" there.

On July 21, after the termination notice had been approved, Johnson met individually with Madsen, again advising him of Chrysler's interest in a mutual termination. Madsen again replied that he wanted to remain as a Chrysler dealer. Johnson then asked Madsen specifically whether he, as an individual, really wanted to remain their dealer in Wheaton. Madsen answered definitely "yes", and in response, Johnson indicated that there must be a way to resolve the problem. He then offered an alternative, speaking "strictly on his own" and without prior discussion with his superiors. In sub-

stance, it contemplated that Madsen would relocate to the new DE facilities on a term agreement basis for a period of one year to eighteen months. During this period Madsen would have the opportunity to prove his ability to sell the high volume of cars that Chrysler thought could be sold in the combined market. If the venture was not successful, the expiration of the term agreement would, of course, mark the termination of their relationship. Madsen indicated he would give the suggestion some thought.

On August 31, Madsen and Ashmore met Hazelroth and Drace at their request. After some time spent in exchanging pleasantries and general conversation Hazelroth presented Madsen with a letter advising Madsen that the Wheaton dealership agreements with Chrysler had been terminated, effective 90 days hence. At the same meeting, Hazelroth again offered to relocate the dealership to any one of various other locations and indicated that if Madsen and his associates could come up with any plan which they thought would cause Chrysler to change its mind, they should contact him.

Thereafter, Johnson met with Madsen, Zwierzycki, D'Ziak and Ashmore on September 14. The emphasis of this meeting was, as predicted in the notes made by McMann during the Review Board meeting, to seek agreement for a mutual termination now that the forced termination notice was outstanding. Madsen asked for an appointment with Hazelroth to discuss a proposal for the future of the dealership which meeting was held on September 27, Drace and Johnson also were in attendance for Chrysler and the other principals in the Wheaton dealership accompanied Madsen.

Madsen's alternate proposal involved either (a) a one year term arrangement in the new DE dealership on Roosevelt Road or (b) termination of the Plymouth franchise with Madsen continuing in downtown Wheaton as a Chrysler-Imperial dealer. The Chrysler representatives discussed the proposal and apparently contacted Eustis in Detroit by phone. Thereafter they advised Madsen

that their original decision would stand and that they would still like to negotiate a mutual termination and would be willing to consider relocating Madsen to another dealership with a smaller potential than that in Wheaton-Glen Ellyn. Madsen then advised the Chrysler representatives that a mutual termination could be had for no less than $75,000 and absent an agreement on these terms, legal action would be taken.

Johnson made another effort to secure a mutual termination from Madsen during the month of October. At this time he was advised that Madsen had placed the matter in the hands of counsel. This action was then filed. As previously noted, plaintiffs have continued to operate the Wheaton CPI dealership after the termination date by agreement of counsel, pending decision of this action.

It must be observed that Chrysler's conduct between March 1964, and even after notice of termination was served, is hardly consistent with the contention it now advances, i. e., that Madsen had clearly defaulted on its contractual obligations and that therefore Chrysler had the unqualified right to terminate the dealership agreement at any time. The evidence set out above leads to but one conclusion: that Chrysler wanted to terminate plaintiff's dealership because it believed that a large, new, modern, corporate-financed dealership in the combined Wheaton-Glen Ellyn sales area would have substantially better results than any private dealer or dealers could obtain. As part of this plan it was necessary to eliminate the two existing dealerships in the area and, in the end, Chrysler decided that it would allow McKie, the existing Glen Ellyn dealer, to operate the proposed DE facility. The fact that Chrysler thought that another type of operation would produce better results obviously does not create the right to terminate an existing dealership on a forced basis. While it might give Chrysler a good faith reason to fail to renew an agreement, Chrysler has chosen to give its dealers continuing agreements terminable only for the causes stated. Con-

versely, the fact that Chrysler's main purpose in terminating Madsen was as indicated above does not mean that it cannot terminate an agreement if cause in fact exists. Whether it was Chrysler's primary consideration—or whether it was a consideration at all—is immaterial. What is material is the validity of defendants' notice of termination.

We conclude that MSR calculated simply as provided in the Chrysler dealership agreements without adjustment for the various factors herein discussed and which results at all times in a substantial number of dealers being in technical default is an arbitrary, coercive and unfair provision since it would enable Chrysler to terminate roughly one-third to one-half of all its dealerships at any time. We conclude also that Chrysler has waived failure to achieve MSR as a default in plaintiffs' dealership agreements by treating it as a performance goal rather than as a condition of those agreements. Moreover, to permit Chrysler to terminate in reliance on plaintiffs' failure to achieve MSR would be particularly unfair here where, at Chrysler's urging, plaintiffs invested substantial funds in new sales and service facilities for the purpose of increasing sales and service volume. Before the remodeling of the new facilities was completed, Chrysler representatives notified plaintiffs of the intention to terminate their franchises so that a cloud has hung over the expanded operation from the start and no measure of normal performance has been possible.

The defendants' termination of plaintiffs' franchises, therefore, constitutes a breach of the dealership agreements and a violation of the Dealers' Day in Court Act.

We come now to the alleged violations of the federal and state antitrust laws. In support of their contention that Chrysler's conduct constitutes such violations, plaintiffs contend that the defendants have restrained or seek to restrain trade in a manner prohibited by Sections 1 and 2 of the Sherman Act, and Sections 3(2) and 3(3) of the Illinois Antitrust Act.

Specifically, they assert that defendants' agreement with McKie, the present Plymouth dealer in Glen Ellyn, by which he will operate the proposed new DE facility on Roosevelt Road, combined with the elimination of plaintiffs' franchises, constitutes a conspiracy and attempt to monopolize the sale of Chrysler products in the Wheaton-Glen Ellyn area. Basic to this contention is the assumption that the relevant product line for purposes of determining competitive effect is properly limited to Chrysler produced automobiles, excluding Dodge cars which are sold through a separate dealer, and that the appropriate geographic market for the same purposes is the Wheaton-Glen Ellyn area. It is, of course, well settled that the first step in measuring the effect of allegedly restraining or monopolizing acts is the determination of the relevant product line and geographic market involved, Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); United States v. E. I. Du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). While the record discloses that there is considerable repeat purchasing by automobile owners, it is also clear that there is substantial interchangeability between comparable models of the four principal manufacturers. The competition between Chevrolet, Ford, Plymouth and Rambler for the mass market is well known and gives rise to advertising budgets which are among the largest in our national economy. It would be unrealistic, therefore, to conclude that Chrysler-Plymouth dealers compete only with themselves for customers.

With respect to the relevant market area, we have previously pointed out in the discussion of MSR that dealers compete and sell with others located outside of their local communities and it would be equally unrealistic to find that the geographic market is limited to the Wheaton-Glen Ellyn area.

■ Accordingly, we conclude that Chrysler's conduct here did not violate either federal or state antitrust laws.

The remaining question is the relief to be granted. Plaintiffs seek a permanent injunction against termination of their franchise agreements without valid cause under such agreements. Defendants, while denying that their asserted termination was invalid urge that, even if the Court finds their action to be a breach of those agreements, no permanent injunction should be granted since, they allege, plaintiffs have an adequate remedy at law, i. e., money damages.

■ Two elemental propositions of law are here involved, first, that courts will not enjoin a breach of contract if money damages can adequately compensate the injured party; second, that a court of equity has power to enjoin such a breach if money damages will be impossible to calculate or will not constitute adequate compensation. The applicable criterion then is: can money damages which would adequately compensate plaintiffs be here computed?

It must first be noted that automobile dealer franchises are not available on the open market. The record is clear that plaintiffs would not be able to use any money damages they might recover to secure a replacement automobile dealer franchise in the Wheaton-Glen Ellyn area in which they have lived and worked their entire lives. If they are to continue as automobile retailers, it will necessarily be in a community new to them, will require an investment not now determinable and the economic success or failure of which is likewise incalculable at present. It will, therefore, be impossible to calculate the amount of money necessary to enable plaintiffs to restore the status quo.

Nor will it be possible to calculate with any degree of certainty the monetary damages plaintiffs will sustain by virtue of defendants' breach. Their past experience will not be a valid measure of what they might reasonably expect to realize from their franchises in the future, since their prior operations were carried on in substantially less adequate facilities than those they now occupy. In addition, during the time they have operated in the new facilities, plaintiffs have been under the threat of termination and their operations could not be considered normal for purposes of computing damages. It must be noted in this connection that, almost simultaneously, some of defendants' agents were urging and assisting plaintiffs to expend substantial sums to expand their facilities while others of defendants' agents were planning to terminate their franchises and operate the expanded facilities until the new location on Roosevelt Road was ready for occupancy, a fine example either of corporate incompetence or duplicity.

Finally, it is to be noted that there is no way of determining for how many years damages would be accruable, since the franchises have no terminal dates and specifically provide that they are to continue indefinitely until cancelled for cause by defendants or on notice by plaintiffs.

■ It seems apparent from the foregoing that money damages which will adequately compensate plaintiffs for defendants' breach of the franchise agreements are not calculable. Under these circumstances an injunction against wrongful termination is the only appropriate relief.

Nothing herein said or decided is intended to suggest that plaintiffs have an indefinite right to remain defendants' franchised dealers regardless of the adequacy of their performance. All that we here hold is that the purported termination on the grounds of failure to meet MSR constitutes, in this instance, a breach of the franchise agreements since MSR as calculated by defendants is an arbitrary, unfair and coercive standard of adequate performance which would enable defendants to cancel between one-third and one-half of its dealerships at any time. In addition, we hold that defendants, by their treatment of

MSR more as a goal than a performance standard, have waived, in the case of plaintiffs at least, any reliance on failure to achieve it as grounds for termination. Finally, we conclude that the motivation for the termination was not plaintiffs' performance or lack thereof but defendants' desire to establish a new, large DE dealership on Roosevelt Road in Wheaton and eliminate plaintiffs as economically as possible. This they might properly do if valid grounds therefor existed but not by utilization of an invalid standard of performance which they themselves ignore except when it suits their convenience.

An injunction consistent with the conclusions set forth herein will be entered.