MILLER PLYMOUTH CENTER, INC.,
Plaintiff,

v.

CHRYSLER MOTORS CORPORATION,
Defendant.

Civ. A. No. 68–190–G.

United States District Court
D. Massachusetts.

April 17, 1968.

Howard M. Miller, Boston, Mass., for plaintiff.

Samuel Adams, Boston, Mass., for defendant.

## ORDER ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

GARRITY, District Judge.

This matter came before the court on plaintiff's motion for a preliminary injunction. Plaintiff seeks to enjoin the defendant during the pendency of this action from terminating its franchise agreements with plaintiff without cause. On the basis of affidavits, depositions and exhibits submitted by both parties, the court makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Plaintiff, a Massachusetts corporation with a principal place of business in Fall River, Massachusetts, is an automobile dealership engaged in the sale and service of automobiles. The voting stock of plaintiff is owned in its entirety by Julius Miller ("Miller").

2. Defendant, a Delaware corporation with its principal place of business in Detroit, Michigan, is an automobile manufacturer. On or about July 1960 Miller was approached by a representative of defendant and asked to make application to sell defendant's automobiles.

3. In March 1961 plaintiff was incorporated for the purpose of selling defendant's automobiles.

4. As a result of Miller's application, on October 13, 1960 defendant gave to plaintiff a six-month letter agreement allowing plaintiff to sell Plymouths and giving it an opportunity to qualify as a

"Direct Dealer." Similar agreements were entered into for Chrysler and Imperial on the same date.

5. On July 27, 1961 plaintiff and defendant executed three "Direct Dealer Agreements" for the sale of Chryslers, Plymouths and Imperials.

6. The three agreements were the same except for references to the particular make of automobiles and differences in the "sales locality."

7. Paragraph 21 of each agreement provides:

[Chrysler, Plymouth or Imperial] may terminate this agreement on not less than ninety (90) days written notice on (1) the failure of DIRECT DEALER to perform fully any of DIRECT DEALER'S undertakings and obligations in Paragraphs 7 through 10 and Paragraph 14 of this agreement * * *

8. Paragraph 7 of each agreement provides:

DIRECT DEALER agrees to sell energetically at retail in the Sales Locality described in Paragraph 1 of this agreement [Chrysler, Plymouth or Imperial] passenger cars and [Chrysler, Plymouth or Imperial] passenger car parts and accessories. DIRECT DEALER agrees to sell at retail in such Sales Locality the number of new [Chrysler, Plymouth or Imperial] passenger cars necessary to fulfill DIRECT DEALER'S Minimum Sales Responsibility, as defined below.

DIRECT DEALER'S Minimum Sales Responsibility will be determined as follows:

From time to time, but at least once a year, [Chrysler, Plymouth or Imperial] will compute the ratio of the number of new [Chrysler, Plymouth or Imperial] passenger cars registered in the most recent 12-month period for which registration figures are available in the [Chrysler, Plymouth or Imperial] Sales Region in which DIRECT DEALER is located to the number of all new passenger cars so registered in that Region. The ratio thus obtained will be applied to the number of all new passenger cars registered during the same 12-month period in DIRECT DEALER'S Sales Locality. The resulting number (and the percentage share of market that such number represents for the Sales Locality) will be DIRECT DEALER'S Minimum Sales Responsibility for this same twelve (12) month period, subject to such adjustment as is described below. '

Where appropriate, [Chrysler, Plymouth or Imperial] will adjust DIRECT DEALER'S Minimum Sales Responsibility to take into account the availability of passenger cars, local conditions, revisions in DIRECT DEALER'S Sales Locality description, the recent trend in DIRECT DEALER'S sales performance, and the other factors, if any, directly affecting sales opportunity.

9. No adjustments to the calculation of plaintiff's Minimum Sales Responsibility ("MSR") in accordance with paragraph 21 of the agreements have been made by defendant.

10. The numbers of defendant's automobiles sold by plaintiff for the calendar years 1964 through 1967 are as follows:

| 1964 | 171 Plymouths | 42 Chryslers | 5 Imperials |
|------|---------------|--------------|-------------|
| 1965 | 184 Plymouths | 50 Chryslers | 4 Imperials |
| 1966 | 106 Plymouths | 48 Chryslers | 3 Imperials |
| 1967 | 144 Plymouths | 54 Chryslers | 5 Imperials |

11. The percentages of MSR attained by plaintiff for the same calendar years are as follows:

|      | Plymouth | Chrysler | Imperial |
|------|----------|----------|----------|
| 1964 | 78.6%    | 76.3%    | 38.4%    |
| 1965 | 63.8%    | 52.4%    | 28.5%    |
| 1966 | 49.4%    | 60.2%    | 55.5%    |
| 1967 | 48.7%    | 73.8%    | 30.0%    |

12. Periodically, defendant's district manager would prepare a "Sales Responsibility Review" ("review"), usually at the end of a quarter and at the end of each year.

13. A copy of each review prepared by defendant's district manager was left with Miller.

14. The reviews indicated that on no occasion did plaintiff meet its MSR.

15. On January 18, 1968, after several discussions in which defendant's representatives encouraged plaintiff to mutually terminate its agreements with defendant, Miller received a 90-day termination notice from defendant.

### Conclusions of Law

Plaintiff's amended complaint is in two counts. The first count alleges that defendant has breached its dealership agreements with plaintiff; the second count alleges that defendant has violated the provisions of the so-called Dealers' Day in Court Act ("the Act"). 15 U.S.C. §§ 1221–1225. Under each count, plaintiff seeks preliminary and permanent injunctions against termination of the agreements without cause or, alternatively, damages. Because the alleged breach also constitutes the alleged violation of the Act, the two counts are closely related and will be discussed together.

■ The operative provision of the Act does not specifically authorize injunctive relief:

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: Provided, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith. 15 U.S.C. § 1222.

Nevertheless, the failure of Congress to provide for injunctive relief under the Act does not negate the general equity power of the court to grant injunctive relief. Bateman v. Ford Motor Company, 3 Cir., 1962, 302 F.2d 63; Dahlberg Brothers, Inc. v. Ford Motor Company, 1965, 272 Minn. 264, 137 N.W.2d 314; Madsen v. Chrysler Corporation, N.D. Ill., 1966, 261 F.Supp. 488, vacated as moot 7 Cir., 375 F.2d 773.

■ However, to grant the injunctive relief which plaintiff seeks would be to decree specific performance of the agreements, either temporarily or permanently. Autowest, Inc. v. Peugeot, Inc., E.D. N.Y., 1966, 287 F.Supp. 718. It is at this point that the two counts blend together because, whether defendant's alleged acts be viewed as a breach of the agreement or as a violation of the Act, the issue is whether the court should use its general

equity power to specifically enforce the agreement.

This agreement is not the type, such as contracts for the sale of land or unique chattels, which is traditionally specifically enforceable. See Autowest, Inc. v. Peugeot, Inc., supra. The reasons why agreements such as these are not specifically enforceable are clearly set out in Thayer Plymouth Center, Inc. v. Chrysler Motors Corp., Cal.App.1967, 63 Cal.Rptr. 148:

> A permanent injunction prohibiting a manufacturer from breaching its contract with a distributor will not be granted where the effect of the injunction would be to specifically enforce the dealership agreement requiring the manufacturer to sell its products to the dealer over an indefinite term, inasmuch as such a decree would impose upon the court the impossible task of supervising continuous performance by the parties; under such circumstances, the dealer should be denied equitable relief and left in a position where he may assert his legal rights under the contract. 63 Cal. Rptr. 150–151.

Although the court in Madsen v. Chrysler Corporation, supra, held that injunctive relief was proper in a case under the Act because of the impossibility of calculating damages, this court agrees with those courts which, while recognizing the difficulty of calculating damages, do not believe the task to be impossible. Thayer Plymouth Center, Inc. v. Chrysler Motors Corp., supra; A. F. L. Motors, Inc. v. Chrysler Motors Corp., E.D.Wis., 1960, 183 F.Supp. 56.

Inasmuch as it would be improper, upon final determination on the merits, to grant permanent injunctive relief and thereby specifically enforce the agreement, there is no basis in equity for granting preliminary injunctive relief. If money damages are proper and adequate relief to plaintiff for the effect upon it of defendant's alleged breach over the period subsequent to the final determination on the merits, so also should they be proper and adequate for the period between the date of the termination and the final determination on the merits. See Note, 8 B.C.Com. and Ind.L.Rev. 293, 315–317 (1967). Furthermore, it would be logically inconsistent in this situation to grant a "preliminary" injunction which could not be finalized in a permanent injunction.

Accordingly, it is ordered that plaintiff's motion is denied.