577 F.2d 624
 1978-2 Trade Cases 62,155
 Don MARQUIS, Plaintiff-Appellant,
v.
CHRYSLER CORPORATION et al., Defendants-Appellees.
Don MARQUIS, Plaintiff-Appellee,
v.
CHRYSLER CORPORATION and Chrysler Motors Corporation,
Defendants-Appellants.
Don MARQUIS, Plaintiff-Appellee,
v.
CHRYSLER CORPORATION, Chrysler Motors Corporation and
Chrysler Realty Corporation, Defendants-Appellants.
 No. 75-2815, 75-2881 and 75-3499.
 United States Court of Appeals,
Ninth Circuit.
 June 29, 1978.
 
 Kristina M. Hanson (argued), San Francisco, Cal., for plaintiff-appellant.
 Franklin Wilson (argued), McCutchen, Black, Verleger & Shea, Los Angeles, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before WRIGHT and SNEED, Circuit Judges, and TAYLOR, District Judge.*
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 In this suit against the corporate defendants Marquis[1] alleged that the manner in which they terminated his Dodge dealership violated the Automobile Dealers' Day in Court Act (15 U.S.C. §§ 1221-1225), the Sherman Act (15 U.S.C. §§ 1-7), and the Robinson-Patman Act (15 U.S.C. §§ 13, 13a, 13b, 13c & 21a). The court directed verdicts for the defendants on all but the Dealers' Act claim, on which the jury returned a verdict of $116,097 for Marquis.
 
 
 2
 On appeal Marquis challenges the directed verdicts disposing of his Sherman Act claims. Chrysler Corporation and Chrysler Motors Corporation cross-appeal the Dealers' Act judgment and Chrysler Realty joins in a challenge to a $2,000 discovery sanction imposed against three of the defendants. Chrysler Financial Corporation is a party only as respondent to the Marquis appeal.
 
 I.
 FACTS
 
 3
 Marquis owned Don Marquis Dodge, an independent, franchised dealership in Concord, California, from 1960 to 1968, when Chrysler Motors terminated the dealership agreement.[2] Under Chrysler Motors' marketing system for Dodge automobiles, the Marquis dealership had primary responsibility for selling cars and trucks in Sales Locality No. 31. That was part of the larger East Bay District, which in turn was part of the San Francisco Sales Region.[3]
 
 
 4
 Don Marquis Dodge operated under a standard franchise known as the Direct Dealer Agreement (the Agreement). During its early months the dealership operated under a temporary letter agreement. Marquis and Chrysler Motors executed formal Dealer Agreements in 1961 and 1963.
 
 
 5
 The Agreement gave Chrysler Motors the right to terminate the dealership on 90 days' notice upon the dealer's "failure . . . to perform fully any of the Direct Dealer's undertakings and obligations" under its terms. Among them was Marquis' duty to sell enough cars and trucks to meet or exceed his Minimum Sales Responsibility (MSR).
 
 
 6
 Marquis was obligated to satisfy separate MSR's for cars and trucks. The MSR was computed as the number of new Dodge cars (or trucks) registered in the sales region during a given period, divided by the total number of all new cars (or trucks) registered there during that period. Total registrations in the sales locality were multiplied by the regional ratio to obtain the dealer's MSR.[4] Periodically, and some time after the expiration of the period to which the MSR applied, the dealer's sales were compared to MSR and his sales performance was analyzed.[5]
 
 
 7
 The Agreement provided that MSR would be adjusted to reflect available vehicle supplies, dealer sales trends, and local conditions affecting the dealer's ability to sell.[6]
 
 
 8
 In accordance with this scheme, the district sales manager for Chrysler Motors' Dodge Division visited the Marquis dealership regularly to conduct a "sales responsibility review." During these visits he presented Marquis with a sales review form which set forth the period's MSR and the dealership's sales. The form included a summary of recommendations to improve sales. Marquis signed the forms to verify the accuracy of their figures, to acknowledge that the review had taken place, and to indicate that he would act on the recommendations.
 
 
 9
 In addition to the sales review sessions Chrysler Motors reminded Marquis of the need to improve sales in other ways. In early 1966 Mr. King, who was then the Dodge regional sales manager, wrote to Marquis that "(n)either you nor Dodge can afford this loss of sales and resulting loss of profit." Later Mr. Loomis, who succeeded King, continued to counsel Marquis about his sales record. In 1963 and 1966 Chrysler Motors prepared special dealer surveys aimed at improving the dealership's sales record. Through these channels and the sales review sessions, Marquis was given numberous suggestions for sales improvement.[7]
 
 
 10
 Don Marquis Dodge consistently failed to meet its MSR. Only in 1966 was MSR attained, and then only for trucks. In other years sales amounted to approximately 51% to 80% of MSR.
 
 
 11
 Early in 1966 two Chrysler Motors representatives showed Marquis a three-acre lot in Concord and asked for his evaluation of it as a dealership site. Marquis told them he thought it lacked accessibility. He asked what the rent would be if the manufacturer acquired the site and leased it to a dealer. When he was told it would be about $9,000 or $10,000 a month, he expressed surprise at the figures. There was little further discussion and as they left the representatives told Marquis that they would "talk about it later."
 
 
 12
 In a month a Chrysler Motors representative again visited Marquis and asked if he had thought further about the new site. Marquis said he still considered it a poor location. On neither occasion was there an express request that Marquis relocate or a statement that his facility was inadequate.
 
 
 13
 In September 1966 Marquis read a newspaper account of Chrysler Motors' purchase of the Concord property and its request for a use permit to construct an auto dealership there.[8] He made calls to Chrysler Motors officials and was assured that the land would not be developed for five to ten years. As it turned out, a corporate-owned Dodge retail facility was constructed on the site soon after the Marquis dealership was terminated.
 
 
 14
 In October 1967, Loomis offered Marquis the services of a Chrysler Motors employee to assist the sales effort, but Marquis declined the offer. Loomis told him that he would watch the dealership's sales figures "with interest." Unbeknown to Marquis, Loomis had already initiated a request for termination of the dealership.[9]
 
 
 15
 On January 5, 1968, Chrysler Motors informed Marquis that his dealership was to be terminated in 90 days. On January 11 he wrote to Mr. McCurry, a vice president of the Dodge Division, asking for reconsideration. McCurry refused by letter on February 6. Marquis wrote again on February 9 and received a similar response. Marquis met with Loomis in mid-February, but the meeting resulted in no change in the decision.
 
 
 16
 Marquis testified that while attending an auto dealers' convention in February he first learned of the Chrysler Motors Appeals Board, an intra-corporate body that reviews dealership termination decisions. Chrysler Motors maintained that all its dealers, including Marquis, were told of the board's creation and function when it was formed late in 1966. No letter to Marquis at the time of, or subsequent to, his termination mentioned his right to appeal to the board.
 
 
 17
 Marquis wrote McCurry a third letter on March 1, requesting that he forward an enclosed letter to the appeals board, explaining that he did not know the board's address. McCurry apparently forwarded the letter to the board because on March 7 the board's secretary wrote Marquis, explaining that, because his request for review was not filed within 31 days of the notice of termination, it was untimely and would not be considered.
 
 
 18
 There followed a series of letters between Marquis and Loomis and McCurry and at least one more meeting between Marquis and Loomis. All of Marquis' pleas for reconsideration proved unavailing and the dealership was terminated in April.
 
 
 19
 In the years 1966-1970 a number of independent Dodge dealers in the East Bay District went out of business. During the same period Chrysler Motors established five new corporate-owned facilities (Dealer Enterprise or D.E. outlets) there.
 
 II.
 THE DEALERS ACT CLAIM
 
 20
 Chrysler contends that it is not a proper party defendant to Marquis' Dealers' Act suit. In addition, Chrysler and Chrysler Motors urge that we reverse the judgment because:
 
 
 21
 a. the claim was barred by the statute of limitations;b. the verdict was not supported by the evidence and was incorrect as a matter of law;
 
 
 22
 c. other errors, including improper jury instructions and evidentiary rulings, prejudiced the defense; and
 
 
 23
 d. the damages award was based on speculation and conjecture.
 
 
 24
 A. The Statute of Limitations.
 
 
 25
 The Dealers' Act includes its own three-year statute of limitations.[10] Marquis received notice of termination on January 5, 1968, to be effective April 4, 1968. He sued on April 2, 1971, more than three years after the termination notice, but less than three years after actual termination.
 
 
 26
 The cross-appellants contend that the limitations period runs from the date Marquis received notice of the termination. Citing Emich Motors Corp. v. General Motors Corp., 229 F.2d 714, 720 (7th Cir. 1956), they argue that Marquis could have instituted suit on the day of notice and that the limitations period ran from that date.
 
 
 27
 Emich, however, is distinguishable and does not stand for the general proposition that the Dealers' Act limitations period runs from the date of the termination notice. In Emich the notice canceled the dealer's contract right to receive cars from the manufacturer. It coincided with actual injury to the dealer and, after giving such notice, "General Motors could not prevent (the dealer) bringing action at that time for the unlawful breach." 229 F.2d at 720.
 
 
 28
 There is no evidence that notice of termination immediately diminished Marquis' rights under the contract. Moreover, the existence of corporate termination review mechanisms belies the contention that after notice the termination decision was irreversible.
 
 
 29
 We hold that Marquis' cause of action accrued on April 4, 1968, the date termination was effective and that this suit was timely brought. Cf. Rea v. Ford Motor Co., 355 F.Supp. 842, 862 (W.D.Pa.1972), vacated on other grounds, 497 F.2d 577 (3rd Cir.), cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974) (cause of action accrued on date of franchise cancellation).
 
 
 30
 B. Liability of Chrysler Corporation.
 
 
 31
 Chrysler Corporation contends that it cannot be liable on the Dealers' Act claim because it was not a party to the Direct Dealer Agreement. The Agreement was between Marquis and Chrysler Motors only.
 
 
 32
 Under the Act, "automobile dealers" may sue "automobile manufacturers" for failure to act in good faith in performing or complying with the franchise terms or in cancelling, not renewing, or terminating the franchise. 15 U.S.C. § 1222. Those manufacturing or assembling cars or trucks and the enterprises distributing them under their control are "automobile manufacturers" within the meaning of the statute. 15 U.S.C. § 1221(a).
 
 
 33
 Chrysler Corporation is clearly a statutory manufacturer and it is undisputed that Chrysler Motors is controlled by it and distributes automobiles so as to be a manufacturer also. The question remains, however, whether Chrysler Corporation can be liable for noncompliance with, or termination of, the franchise agreement in the absence of contractual privity or some dealing with Marquis.
 
 
 34
 In these circumstances the courts generally have held that one not a party to the agreement cannot be liable under the Act. See Lawrence Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 461 F.2d 608, 613 (7th Cir. 1972); York Chrysler-Plymouth v. Chrysler Credit Corp., 447 F.2d 786, 791 (5th Cir. 1971); Evanston Motor Co., Inc. v. Mid-Southern Toyota, 436 F.Supp. 1370, 1375 (N.D.Ill.1977); Joe Westbrook, Inc. v. Chrysler Corp., 419 F.Supp. 824, 831-32 (N.D.Ga.1976); Smith-Johnson Motors Corp. v. Hoffman Motors Corp., 411 F.Supp. 670, 673-74 (E.D.Va.1975).
 
 
 35
 A manufacturer may be liable notwithstanding it is not a party to the franchise if the party contracting with the dealer is the manufacturer's agent or merely a "straw man" erected to insulate it from statutory liability. Stansifer v. Chrysler Motors Corp., 487 F.2d 59, 64 (9th Cir. 1973). Although Chrysler Motors is a subsidiary of Chrysler Corporation, there was no evidence that it was Chrysler Corporation's agent in dealing with Marquis. We think the Fifth Circuit's comments in York Chrysler-Plymouth v. Chrysler Credit Corporation are apposite:
 
 
 36
 Either (Chrysler Corporation or Chrysler Motors) could be sued for failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise. However, there being no showing that would make either responsible for the acts of the other on an agency theory, and the facts indicating that they are separate legal entities each operating in its own sphere, only the one which has entered into a franchise agreement could be held accountable for performing or complying with it. Since Chrysler Corporation was not a party to the franchise and had no legal responsibility to plaintiffs for the acts of Chrysler Motors, which signed the franchise, it should have been dismissed from the suit and the judgment should not have been entered against it.
 
 447 F.2d at 791 (citations omitted).[11]
 
 37
 The verdict, insofar as it imposed liability on Chrysler Corporation, was clearly erroneous and is reversed.
 
 
 38
 C. Sufficiency of the Claim.
 
 
 39
 Chrysler Motors strenuously argues that Marquis' claim under the Dealers Act is legally insubstantial and unsupported by the evidence.[12] It asserts that his repeated failure to satisfy MSR established that his sales representation was unsatisfactory and that termination of unsatisfactory dealers is permitted under the Act.[13] Moreover, it stresses that the key to recovery under the Act is a manufacturer's failure to act in good faith and that such a failure is not demonstrated unless there has been coercion, intimidation, or threats of coercion or intimidation. For these reasons Chrysler Motors contends that the district court erred in denying its motion for a directed verdict.
 
 
 40
 At trial Marquis contended that he was the victim of a coercive and intimidating course of conduct. He claimed that the sales quotas assigned him were unfair and never adjusted to reflect local conditions. Although the reason for termination was ostensibly insufficient sales, Marquis contended that the defendants had ulterior motives (developing the newly acquired site in Concord and removing him from the market to establish a corporate-owned facility). He also argued that the defendants frustrated his attempt to obtain review of the termination decision in furtherance of their decision to take him out of business.
 
 
 41
 1. Standard of Review.
 
 
 42
 When we review a denial of a motion for a directed verdict or for judgment n. o. v., we consider
 
 
 43
 whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the nonmoving party. Butte Copper & Zinc Co. v. Amerman, 157 F.2d 457, 458 (9th Cir. 1946). "Substantial evidence is more than a mere scintilla." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); Butte Copper & Zinc Co., supra. The evidence must be examined in a light most favorable to the nonmovant, Continental Ore v. Union Carbide & Carbon Corp., 370 U.S. 690, 696 & n.6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and there can be no weighing of evidence. Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Finally, appellant . . . is entitled to the benefit of all reasonable inferences that may be drawn from its evidence. Standard Oil Co. v. Moore, 251 F.2d 188, 198 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).
 
 
 44
 Chisholm Bros. Farm Equipment Co. v. International Harvester, 498 F.2d 1137, 1140 (9th Cir.), cert. denied, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974), quoted in Autohaus Brugger, Inc. v. Saab Motors, Inc., 567 F.2d 901, 909-10 (9th Cir. 1978).
 
 
 45
 2. Sub-MSR Sales as a Justification for Termination.
 
 
 46
 Chrysler Motors contends that Don Marquis Dodge inadequately marketed its products and that, far from being coercive or intimidating, the termination was justified, even compelled, by the dealership's consistently poor sales record. It points to seven years of sub-MSR sales as the sole reason for termination and relies upon its rights under the Agreement and the Act to absolve it from liability.
 
 
 47
 Chrysler Motors argues that MSR is a "self-adjusting formula which requires a dealer to perform at nothing more than the level of an average dealer in the region" and it cites Victory Motors of Savannah, Inc. v. Chrysler Motors Corp., 357 F.2d 429 (5th Cir. 1966). In Victory Motors the court refused to find MSR a coercive franchise provision and commented that use of the MSR formula is consistent with the manufacturer's right to terminate dealers providing inadequate market representation.
 
 
 48
 We do not think that the good faith requirement . . . prevents a manufacturer from terminating a contract . . . where the dealer has, over a long period of time, violated a valid and material clause of the contract and has failed to comply with the continuing insistence of the manufacturer upon performance.
 
 
 49
 357 F.2d at 432 (quoting Woodard v. General Motors, 298 F.2d 121 (5th Cir.), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288 (1962). Chrysler Motors asserts that MSR "has consistently been upheld as a reasonable standard for sales performance."[14]
 
 
 50
 Cross-appellant places other reliance on the Dealers Act's legislative history which makes it clear that the Act was not intended to prevent a manufacturer from ending its relationship with a substandard sales representative.
 
 
 51
 The bill . . . does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the bill curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise.
 
 
 52
 H.R.Rep. No. 2850, 84th Cong., 2d Sess. (1956) (hereafter H.Rep.), reprinted in (1956) U.S.Code Cong. & Admin.News, pp. 4596, 4603.
 
 
 53
 We agree that the Dealers' Act did not extinguish automobile manufacturers' right to terminate franchised dealers who represent them inadequately and that a dealership may be lawfully terminated when the dealer consistently has violated "a valid and material clause of (his) contract and has failed to comply with . . . continuing insistence . . . upon performance." Victory Motors, 357 F.2d at 432 (emphasis added) (quoting Woodard, supra ). But we cannot say that in the circumstances presented here Marquis' failure to meet his MSR sales quota, taken alone, requires that Chrysler Motors' actions could not as a matter of law violate the statutory requirement of good faith.
 
 
 54
 The nature of MSR renders it suspect as the single indicator of satisfactory sales performance. Chrysler Motors itself describes MSR as requiring Dodge dealers to perform "at the level of an average dealer in the region." An "average" necessarily comprehends a range of numbers serving as the basis for computation. It follows that when dealers' sales figures are averaged, some dealers must have sales levels below that average.
 
 
 55
 The operation of MSR in dealer franchises which on their faces are terminable only for cause has the practical effect of transforming a large proportion of those agreements into franchises terminable at the pleasure of the manufacturer. This point was ably explained by Judge Will in Madsen v. Chrysler Corporation, 261 F.Supp. 488, 491-500 (N.D.Ill.1966), vacated as moot, 375 F.2d 773 (7th Cir. 1967). We recently acknowledged that selective enforcement of unrealistic sales quotas can rise to the level of a Dealers Act violation. Autohaus Brugger, 567 F.2d at 912 (citing Madsen, supra ) (dictum).
 
 
 56
 We do not hold that MSR is an inherently coercive or intimidating franchise term or that termination for sub-MSR sales is a per se violation of the Dealers' Act. We hold only that on these facts, where the dealership operated at sub-MSR levels for a considerable period, during which the sales requirement consistently was treated as a goal, and where there is evidence that termination was motivated by other reasons, the dealer's failure to satisfy MSR does not by itself establish that sales performance was so poor that termination could not violate the Act.[15]
 
 
 57
 3. The Statutory Duty of Good Faith.
 
 
 58
 Chrysler Motors stresses that to recover under the Act Marquis must show that it terminated his dealership without good faith within the "limited and restricted meaning" given the term in the statute, Autohaus Brugger, 567 F.2d at 911, and that the court is not to construe that standard liberally. Milos v. Ford Motor Co., 317 F.2d 712, 715 (3rd Cir.), cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125 (1963).
 
 
 59
 The courts have held consistently that the Act creates a cause of action "an indispensable element of which is not the lack of good faith in the ordinary sense but a lack of good faith in which coercion, intimidation, or threats thereof, are at least implicit." Lawrence Chrysler Plymouth, Inc., 461 F.2d at 610. See also Autohaus Brugger, Inc. v. Saab Motors, Inc., 567 F.2d at 910-11; Fray Chevrolet Sales, Inc. v. General Motors Corp., 536 F.2d 683, 685 (6th Cir. 1976); Randy's Studebaker Sales, Inc. v. Nissan Motor Corp., 533 F.2d 510, 514-15 (10th Cir. 1976); Overseas Motors, Inc. v. Import Motors Ltd., 519 F.2d 119, 124-25 (6th Cir.), cert. denied, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); Salco Corp. v. General Motors Corp., 517 F.2d 567, 571 (10th Cir. 1975); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556 (2d Cir. 1970); Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932, 935 (5th Cir.), cert. denied, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967).
 
 
 60
 Coercion or intimidation has been defined as " 'a wrongful demand which will result in sanctions if not complied with.' " Fray Chevrolet Sales, Inc. v. General Motors Corp., 536 F.2d at 685; Randy's Studebaker Sales, 533 F.2d at 515-16; Autowest, 434 F.2d at 561. Cross-appellants reason from this that because Marquis did not show that they expressly demanded something they had no right to demand, he cannot recover under the Act. Their theory is that a cause of action does not lie unless there is an express "wrongful demand enforced by threats of coercion." Diehl & Sons, Inc. v. Int'l Harvester, 426 F.Supp. 110, 124 (E.D.N.Y.1976). See also Autohaus Brugger, 567 F.2d at 911; Autowest, 434 F.2d at 561.
 
 
 61
 We recognize that the Act is drafted in restrictive terms, but its scope is not as limited as Chrysler Motors contends. "The existence of coercion or intimidation depends on the circumstances arising in each particular case and may be inferred from a course of conduct." H.Rep., (1956) U.S.Code Cong. & Admin.News at 4603 (emphasis added); Autohaus Brugger, 567 F.2d at 911. The manufacturer's wrongful demand can be implicit, inferable from "all the facts and circumstances without a showing of a formal demand." Diehl & Sons, 426 F.Supp. at 124.
 
 
 62
 The evidence showed that the Marquis dealership operated for more than seven years with sub-MSR sales. Marquis entered into two Direct Dealer Agreements at times when sales were below MSR. Although Chrysler Motors' sales representatives periodically critiqued the dealership's performance, these reviews stressed MSR as a goal to be attained through implementation of sales improvement suggestions.
 
 
 63
 The jury could have concluded that Chrysler Motors' representatives never informed Marquis that, as a result of sub-MSR sales, the dealership was subject to termination at any time.[16] During this period Chrysler Motors encouraged Marquis to continue to expand and invest in his business.[17] Unlike Victory Motors, supra, there was no "continuing insistence on performance" of the MSR provision.
 
 
 64
 Moreover, Marquis Dodge's MSR was never adjusted downward, although Marquis showed a variety of local conditions that he claimed inhibited his ability to sell cars. There was adequate evidence from which the jury could conclude that Chrysler Motors never intended to adjust MSR as the franchise stated it would.[18]
 
 
 65
 In 1966 Chrysler Motors acquired land for a new and larger dealership within Marquis' sales area and there is evidence that it resolved to take him out of business when he was unreceptive to relocating.[19]
 
 
 66
 In the fall of 1967, after Loomis had requested that the Marquis franchise be terminated, he met with Marquis but gave no indication that Chrysler Motors was then ready to stand on its right to terminate the dealership. There was evidence that Marquis' sales were improving at the time termination was effected and that Chrysler Motors was less than conscientious in processing Marquis' request for review of the termination decision.[20]
 
 
 67
 We think that Chrysler Motors breached the statutory duty of good faith. Rather than enforcing the MSR clause as written or adjusting it to excuse periods of sub-MSR sales, it permitted Marquis to continue in business with sales below MSR. Then, when it suited Chrysler Motors' purposes, it demanded compliance with MSR post facto and, pointing to the dealership history of sub-MSR sales, terminated the franchise.
 
 
 68
 The jury considered the motivation, timing and manner of termination to be intimidating and coercive in light of all the facts and circumstances. Chrysler Motors' conduct in this case was precisely the kind of intimidating and overbearing manufacturer conduct that the Act was designed to proscribe. E. g., Madsen v. Chrysler Corp., supra; Swartz v. Chrysler Motors, 297 F.Supp. 834 (D.N.J.1969) (preliminary injunction).[21]D. Jury Instructions.
 
 
 69
 Chrysler Motors contends that the court's instructions confused the statutory good faith standard with the more general doctrine of bad faith. It argues that this confused the jury and allowed it to return a verdict for Marquis based on conduct not violative of the statute. It complains particularly that the trial judge's deviations from the strict statutory language defining good faith hopelessly misled the jury and patently misstated the law.[22]
 
 
 70
 In support, it cites several recent cases that hold that erroneous instructions are not cured by correct ones in other portions of the charge but must be expressly corrected and "expunged" from the jurors' minds. Seltzer v. Chesley, 512 F.2d 1030, 1035 (9th Cir. 1975). See also Houston v. Herring, 562 F.2d 347, 348-49 (5th Cir. 1977); Pollock v. Koehring Co., 540 F.2d 425, 426-27 (9th Cir. 1976).
 
 
 71
 As the cited cases make clear, however, "(t)he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." Houston, 562 F.2d at 349 (quoting Borel v. Fiberboard Paper Products Corp., 493 F.2d 1076, 1100 (5th Cir. 1978)). In Houston, the court found that the instructions "emphatically and erroneously" misstated the law, necessitating reversal. 562 F.2d at 349.
 
 
 72
 Similarly, in Pollock, a tort case, the trial judge twice instructed the jury clearly and incorrectly on the burden of proof and assumption of risk. Although other portions of the charge were correct, the instructions as a whole remained contradictory when the case went to the jury. 540 F.2d at 426.
 
 
 73
 Chesley also involved instructions that were clear misstatements of law and the appeals court held that the error had been cured only because the trial judge expressly corrected himself and ordered the jurors to disregard his earlier mistake. 512 F.2d at 1035-36.
 
 
 74
 This is a different case. The trial judge separately charged the jury as to the applicable law and counsel were then permitted to argue the question of liability. During the charge the judge emphasized the Act's restrictive definition of the good faith standard and read the appropriate statutory sections to the jury verbatim.
 
 
 75
 As he recapped the parties' allegations, the judge repeatedly referred to the necessity that there be coercion or intimidation before liability can be imposed. The occasional references to "bad faith" were not contradictory of other portions of the charge because when the term was used the judge often added "as defined in the Act," or he employed the term as part of his explanation of the statutory prerequisites to liability.
 
 
 76
 In short, although we recognize that erroneous instructions must be cured expressly, considering the charge as a whole, we are convinced that "the substance of the applicable law was fairly and correctly covered." Pollock, 540 F.2d at 426 (citing Bolden v. Kansas Southern Ry. Co., 468 F.2d 580 (5th Cir. 1972)).
 
 
 77
 E. Other Alleged Errors.
 
 
 78
 1. Plaintiff's Exhibit 1.
 
 
 79
 Chrysler Motors contends that it was error to admit in evidence its dealer prospectus given to Marquis in 1960. It argues that the prospectus was irrelevant to its good faith and that its admission invited the jury to consider liability based on a fraudulent inducement which occurred, if at all, eight years before termination of the Marquis dealership.
 
 
 80
 Under the Federal Rules of Evidence, questions of relevancy and admissibility are committed to the trial court's discretion. We will not overturn its ruling unless there has been an abuse that affects substantial rights. See generally 1 Weinstein's Evidence P 103(01), P 401(01) & (08), and Fed.R.Evid. 401, 402 & 403.
 
 
 81
 In suits arising under the Dealers' Act the trier of fact may properly consider the entire course of dealing between dealer and manufacturer. York Chrysler-Plymouth, 447 F.2d at 793; American Motors Sales Corp. v. Semke, 384 F.2d 192, 196 (10th Cir. 1967). See H.Rep., (1956) U.S.Code Cong. & Admin.News at 4603.
 
 
 82
 The prospectus was relevant to the course of dealings between the parties and had some bearing on Marquis' contention that the manufacturer's sales expectations had been treated from the outset as "goals" rather than as mandatory quotas.
 
 
 83
 Moreover, Chrysler Motors' complaint that the exhibit introduced elements of fraudulent inducement into the jury's consideration is not well taken. As we have said, the jury was properly instructed on the issues and there is no reason to conclude that it ignored the instructions to Chrysler Motors' prejudice.
 
 
 84
 The trial court's ruling was not an abuse of discretion.[23]
 
 
 85
 2. Failure To Inform The Jury Expressly That The Antitrust
 
 
 86
 Claims Were No Longer Before It.
 
 
 87
 Chrysler Motors argues that it was prejudiced by the trial court's refusal to inform the jury expressly that the plaintiff's antitrust claims had been eliminated from the case and by its failure to withdraw from evidence exhibits allegedly relevant solely to those claims.
 
 
 88
 It is the trial court's duty to clarify the issues for the jury. The trial judge did so here, instructing that the Dealers' Act claim was the "sole issue" to be considered and advising counsel to address only that claim in closing argument.
 
 
 89
 Moreover, the defendants did not submit a proposed instruction on the point and first mentioned it in chambers after the Dealers' Act charge had been given. At that point the court determined that the jury's task had been clearly explained. Because the evidence before the jury was for the most part relevant to the defendants' course of conduct and methods of doing business, the judge concluded that argument should not be delayed while all the evidence was reviewed so that a very small part of it could be excluded. Cf. York Chrysler-Plymouth, 447 F.2d at 792 n.6.
 
 
 90
 The judge ruled correctly under the circumstances and the jury's deliberations were clearly and accurately directed by the instructions given.
 
 
 91
 F. Damages.
 
 
 92
 The award of damages is attacked on the ground that it was based only on the speculative and conjectural testimony of Iles, the plaintiff's expert. He was a certified public accountant with expertise in automobile dealership finances who offered his opinion as to profits lost by the termination and as to the value of the business when it ceased operation.
 
 
 93
 He was confident that his estimate of the profits lost from termination throughout 1974 was accurate and conservative. The verdict of $116,097 reflected the jury's acceptance of that testimony, as the amount equalled Iles' estimates minus Marquis' earnings from other employment during that period.
 
 
 94
 Chrysler Motors maintains that Iles' testimony was purely speculative and was contradicted by evidence that the dealership had been consistently unprofitable. Although the dealership had cumulative losses of $21,000 prior to 1967, Iles testified that 1967 had been a profitable year. The defendants disagreed, pointing to a large unsecured indebtedness discharged by Marquis' post-termination bankruptcy. They contended that the indebtedness accrued during 1967 and that, in light of it, 1967 could not have been profitable. Iles testified that there was no evidence that the debts had been generated by the dealership in that year. We think that, given the conflicting theories, the jury could reasonably have found that there were dealership profits during 1967.
 
 
 95
 Using his 1967 figures as a base, and drawing on the dealership sales figures for early 1968, Iles projected his estimate of profits that would have accrued but for the termination. He explained the assumptions upon which the projections were based (including the assumption that the dealership would capture an increasing share of car sales in the locality) and described the data and documentation, including local and industry-wide sales trends, upon which his computations were based.
 
 
 96
 The defendants cross-examined him at length and exposed to the jury what they believed to be fatal flaws in his analysis. They offered no evidence of their own on the issue of damages.
 
 
 97
 The parties agree that lost profits are properly awardable in Dealers Act suits. Rea v. Ford Motor Co., 560 F.2d 554, 557 (3rd Cir. 1977); Randy's Studebaker Sales, 533 F.2d at 518-19; American Motors Sales Corp. v. Semke, 384 F.2d at 199-200.
 
 
 98
 Chrysler Motors argues, however, that there was so little sound evidence of lost profits that the matter should have been taken from the jury.
 
 
 99
 It is not enough, however, that several of (the expert's) assumptions may be open to question. Instead, the issue is whether the probative value of the expert's testimony was so slight that it should not have been submitted to the jury.
 
 
 100
 Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 999 (5th Cir. 1976). We have reviewed Iles' testimony and conclude that it cannot be characterized as so insubstantial as to justify removing the damage question from jury consideration.
 
 
 101
 Moreover, we conclude that the testimony provided a sufficient basis for the jury's award.
 
 
 102
 Damages must be actual, not speculative or conjectural. But they are not rendered speculative or conjectural merely because they cannot be calculated with mathematical exactness. It is sufficient if a reasonable basis of computation is afforded, even though the result may be only an approximation. . . . Ordinarily, it is the exclusive function of the jury to fix the amount of damages.
 
 
 103
 Loew's, Inc. v. Cinema Amusements, 210 F.2d 86, 95 (10th Cir. 1954) (citations omitted). See also Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 376-79, 47 S.Ct. 400, 71 L.Ed. 684 (1927).
 
 
 104
 The plaintiff here presented "data from which the amount of probable loss could be ascertained as a matter of reasonable inference." Cecil Corley Motor Co. v. General Motors Corp., 380 F.Supp. 819, 854 (M.D.Tenn.1974) (quoting Eastman Kodak Co., supra ). See also Hannigan v. Sears, Roebuck and Co., 410 F.2d 285, 293 (7th Cir. 1969).[24]
 
 
 105
 Iles' assumptions and estimates were not demonstrably false or unreasonable. Certainly some facets of his testimony were weak, but his opinion as a whole was well grounded in his investigation, inquiries, knowledge and non-frivolous assumptions. This method of computation was sufficient to present a jury question. See Autowest, 434 F.2d at 566.
 
 
 106
 We note further that the expert testimony here did not concern complex or sophisticated computations generating "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 87 (9th Cir. 1969) (quoting Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2nd Cir. 1962)). The testimony instead was a straightforward projection of profits for a small business. Cf. Eastern Air Lines, Inc., 532 F.2d at 999-1000.
 
 III.
 THE ANTITRUST CLAIMS
 
 107
 Marquis alleged that Chrysler Corporation, Chrysler Motors, Chrysler Realty, and Chrysler Financial conspired to eliminate him as an independent Dodge Dealer, unlawfully restraining trade in violation of § 1 of the Sherman Act, and that the defendants' conduct was an attempt to monopolize in violation of § 2. After both sides had rested, the district judge directed verdicts for the defendants. Marquis has appealed.
 
 
 108
 A. Standard of Review.
 
 
 109
 Marquis contends that directed verdicts in antitrust actions must be reviewed searchingly in light of the Supreme Court's admonition that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles . . . ." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), quoted in Cornwell Quality Tools Co. v. C. T. S. Co., 446 F.2d 825, 832 (9th Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972).
 
 
 110
 We have followed that view and expressed our preference that summary procedures be employed with caution in such cases. See, e. g., Mutual Fund Investors v. Putnam Management Co., 553 F.2d 620, 622, 624 (9th Cir. 1977); Timberlane Lumber Co. v. Bank of America N. T. & S. A., 549 F.2d 597, 602 (9th Cir. 1976); Javelin Corp. v. Uniroyal, Inc., 546 F.2d 276, 280 (9th Cir. 1976). On several occasions we have assumed that the Poller admonition applies to directed antitrust verdicts. E. g., Chisholm Bros. Farm Equip. Co., 498 F.2d at 1139-40; Cornwell Quality Tools, 446 F.2d at 832.
 
 
 111
 Our recent cases, however, have applied the general review standard for directed verdicts in the context of complex antitrust litigation. That standard is whether, viewing the evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party and without weighing witnesses' credibility, a reasonable jury could have reached but one conclusion as to the verdict. See Fount-Wip, Inc. v. Reddi-Wip, Inc., 568 F.2d 1296, 1300 (9th Cir. 1978); Janich Bros. v. American Distilling Co., 570 F.2d 848, 852-53 (9th Cir. 1977); Greyhound Computer Corp., Inc. v. Int'l Business Machines, 559 F.2d 488, 492 (9th Cir. 1977); Santa Clara Valley Distributing Co., Inc. v. Pabst Brewing Co., 556 F.2d 942, 944 (9th Cir. 1977).[25] We are convinced that these cases applied the correct standard of review and we shall apply it to Marquis' appeal.
 
 
 112
 B. The Section 1 Claim.
 
 
 113
 Marquis' theory under § 1 was that the corporate defendants acted in concert to terminate his dealership and to replace it with a D.E. facility and that the purpose and effect of their conduct was to restrain trade.
 
 
 114
 Assuming there was sufficient evidence that the defendants acted in concert, viewing the record as a whole, we conclude that a reasonable jury could not have returned a verdict for Marquis on the § 1 claim.
 
 
 115
 This circuit adheres to the rule that a corporation has the right to deal with whom it pleases and to select its customers, provided that there is no effect which contravenes the antitrust laws. See, e. g., Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1220 (9th Cir. 1977); Ricchetti v. Meister Brau, Inc., 431 F.2d 1211, 1214 (9th Cir. 1970), cert. denied, 401 U.S. 939, 91 S.Ct. 934, 28 L.Ed.2d 219 (1971).
 
 
 116
 Mutual Fund Investors, 553 F.2d at 626.
 
 
 117
 A manufacturer's refusal to deal with a distributor or a dealer does not violate the antitrust laws merely because it adversely affects the entity refused. In fact, such effects are immaterial when the refusal is "for business reasons which are sufficient to the manufacturer . . . in the absence of any arrangement restraining trade." Bushie v. Stenocord Corp., 460 F.2d 116, 119 (9th Cir. 1972) (quoting Ricchetti, 431 F.2d at 1214).[26]
 
 
 118
 Marquis did not show that the defendants' actions were conceived to restrain trade or that they resulted in anticompetitive market effects. They acted to improve their distribution system by eliminating a dealer they considered ineffective and replacing him with a more efficient outlet.
 
 
 119
 Uncontroverted evidence established that the defendants did not conspire to establish and maintain corporate-owned dealerships in the "major East Bay markets," as Marquis alleged.[27] The defendants showed that corporate-owned facilities are established only as a last resort and that such dealerships are transferred to private, independent dealers as soon as possible. Furthermore, even if Marquis could show that his dealership was satisfactory, that would not compel a different result. Stenocord, 460 F.2d at 119-20.
 
 
 120
 This is a kind of dealer termination that we have in the past considered permissible under the Sherman Act. See, e. g., Knutsen v. Daily Review, 548 F.2d 795, 803 (9th Cir. 1976); Chisholm Bros. Farm Equipment Co., 498 F.2d at 1143; Stenocord, 460 F.2d at 119; Joseph E. Seagram & Sons, 416 F.2d at 76.
 
 
 121
 Although the manner in which termination was effected violated the Dealers' Act, the record is clear that it did not run afoul of § 1 of the Sherman Act.[28] The district judge correctly directed a verdict for the defendants.
 
 
 122
 C. The Section 2 Claim.
 
 
 123
 Marquis' claim that the defendants' conduct was an attempt to monopolize in violation of § 2 of the Sherman Act was also resolved against him by directed verdict. Again we conclude that the district court correctly disposed of the issue.
 
 
 124
 We have said that to establish a prima facie case, a plaintiff must show (1) specific intent to control prices or destroy competition in a part of commerce; (2) predatory conduct directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success. Janich Bros., 570 F.2d at 853.
 
 
 125
 The three elements are interrelated, and we have held that a dangerous probability of success may be inferred from proof of specific intent coupled with proof of predatory conduct, and that specific intent may sometimes be inferred from the predatory conduct. Id. (citing Hallmark Industry v. Reynolds Metals Co., 489 F.2d 8 (9th Cir. 1973), cert. denied, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974), and Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964)).
 
 
 126
 Thus, while a plaintiff must present substantial evidence on all three elements of attempted monopolization to avoid a directed verdict, proof of predatory or anticompetitive conduct which can serve as the basis for a substantial claim of restraint of trade will, in some circumstances, permit an inference of specific intent and then in turn of dangerous probability. Thus, we may limit our initial task to a determination of whether a reasonable jury could conclude that (the defendants) engaged in such conduct.
 
 
 127
 Janich Bros., 570 F.2d at 854.
 
 
 128
 Marquis would have us infer specific intent and dangerous probability of success from the conduct underlying his successful Dealers' Act suit. But the Dealers' Act was intended to supplement the antitrust laws, and every Dealers' Act violation will not necessarily amount to an actionable antitrust violation. See, e. g., Autowest, 434 F.2d at 561.
 
 
 129
 In discussing the claim made under § 1 of the Sherman Act, we determined that a reasonable jury could not have concluded that the termination of Marquis' dealership constituted conduct that could serve as the basis for a substantial claim of restraint of trade. Our conclusion that the directed verdict was proper on the § 2 claim readily follows.[29]
 
 IV.
 THE DISCOVERY SANCTIONS
 
 130
 The district court ordered Chrysler Corporation, Chrysler Motors, and Chrysler Realty to pay $2,000 to Marquis' attorney as compensation for expenses and fees incurred as a result of their failure to produce documents required by discovery. The judge based his order on the magistrate's finding that
 
 
 131
 (i)t does seem reasonably clear that defendants simply have not produced the documents. . . .
 
 
 132
 I believe the defendants' conduct regarding discovery in this case has required the plaintiff to bring motions to compel discovery that would otherwise have been unnecessary. There is no substantial justification for defendants' failure to comply with the Order in all respects or the . . . discovery requests.
 
 
 133
 The court ordered the sanction only after providing the defendants an opportunity to seek reconsideration by the magistrate, who refused to alter the recommended sanction.
 
 
 134
 When a party's conduct during discovery necessitates its opponent's bringing motions which otherwise would have been unnecessary, the court may properly order it to pay the moving party's expenses unless its conduct was "substantially justified" or other circumstances make the award "unjust." Fed.R.Civ.P. 37(a)(4). Recent amendments to the rule make it clear that such awards may be imposed more frequently to discourage unnecessary involvement of the court in discovery. See generally 4A Moore's Federal Practice P 37.02(10. 2) at 37-44 (1975).
 
 
 135
 Imposition of discovery sanctions is committed to the trial court's discretion. Von Brimer v. Whirlpool Corp., 536 F.2d 838, 844 (9th Cir. 1976). On review we do not consider whether we would have applied the sanction, but rather whether the court below abused its discretion in doing so. National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 642, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976).
 
 
 136
 Although the failure to produce may not have been in bad faith, the presence or absence of bad faith is relevant to the choice of sanctions rather than to the question whether a sanction should have been imposed. In view of the range of sanctions available, even negligent failures to allow reasonable discovery may be punished. David v. Hooker, Ltd., 560 F.2d 412, 420 (9th Cir. 1977).
 
 
 137
 There was no abuse of discretion in the district court's imposition of a light sanction against these defendants.
 
 V.
 CONCLUSION
 
 138
 The Dealer's Act judgment is affirmed as to Chrysler Motors but reversed as to Chrysler Corporation. The judgment for the defendants on the Sherman Act claims is affirmed, as is the order imposing discovery sanctions.
 
 
 
 *
 Senior District Judge, of the District of Idaho
 
 
 [1]
 Don Marquis died during the pendency of this appeal and his wife has been substituted in her capacity as special administrator of his estate. For convenience we shall refer to the plaintiff-appellant as "Marquis."
 
 
 [2]
 Until 1963 Don Marquis Dodge operated as a partnership, but in that year Marquis purchased his partner's interest for $25,000
 
 
 [3]
 The San Francisco Sales Region encompassed Northern California and all of Nevada except Las Vegas. The East Bay Sales District comprised Alameda and Contra Costa counties
 At the time Chrysler Motors terminated Marquis' dealership, Sales Locality No. 31 included five California towns: Concord, Martinez, Pleasant Hill, Port Chicago and Port Costa.
 
 
 [4]
 The Agreement provided:
 Direct Dealer (Marquis) minimum sales responsibility will be determined separately for Dodge passenger cars and Dodge trucks as follows:
 From time to time, but at least once a year, Dodge will compute the ratio of the number of new Dodge passenger cars or Dodge trucks, as the case may be, registered in the most recent 12-month period for which registration figures are available in the Dodge sales region in which Direct Dealer is located, to the number of all new passenger cars or trucks, as the case may be, so registered in that region. The ratio thus obtained will be applied to the number of all new passenger cars or trucks, as the case may be, registered during the same 12-month period in the Direct Dealer's sales locality.
 The resulting number (and the percentage share of market that such number represents for the sales locality) will be Direct Dealer's minimum sales responsibility for the same 12-month period, subject to such adjustment as is described below.
 
 
 [5]
 The "sales responsibility review" could not be conducted until regional vehicle registration data were received and analyzed to compute MSR. As a result, the reviews were normally accomplished using figures that were several months old. For example, a sales review session in October might consider registration and sales figures only through June
 
 
 [6]
 The applicable provision of the Agreement was:
 Where appropriate, Dodge will adjust Direct Dealer's minimum sales responsibility to take into account the availability of motor vehicles, local conditions, revisions in Direct Dealer's sales locality description, the recent trend in Direct Dealer's sales performance and the other factors, if any, directly affecting sales opportunity.
 
 
 [7]
 The recommendations recorded on the sales responsibility review forms ranged from the very general (e. g., "upgrade present sales force and increase if necessary to cover surrounding market(;) (a)dvertise if necessary & direct contacts" and "(r)ealign management teams") to the very specific (e. g., "(a)dd two salesmen," or "(s)et up an advertising budget of $30 per new car based on MSR figures."
 Marquis complied with most of them. He purchased his partner's interest shortly after sales reviews that identified "partnership difficulties" as a cause of slumping sales. In 1965 he leased additional property to enlarge his facilities for trucks and used cars. Several times he invested more personal funds in the dealership in response to manufacturer recommendations that he increase his investment in the business.
 
 
 [8]
 The land purchase coincided closely with the timing of the memo referred to infra at note 9
 
 
 [9]
 Loomis requested that the dealership be terminated in a letter dated September 1967. There was other evidence that by 1966 eventual termination of the Marquis franchise was a foregone conclusion. One of plaintiff's exhibits was a Chrysler Motors memorandum that expressed the basis of the decision to take Marquis out of business in terms of his reluctance to relocate his dealership. See discussion supra
 
 
 [10]
 Limitations
 Any action brought pursuant to this chapter shall be forever barred unless commenced within three years after the cause of action shall have accrued.
 15 U.S.C. § 1223.
 
 
 [11]
 The fact that this lawsuit could be characterized as one for breach of the duty of good faith in relation to the termination of the franchise, rather than in relation to compliance with or performance of its terms is of no consequence. A cause of action based on either requires privity or demonstration of an agency relationship. see Joe Westbrook, 419 F.Supp. at 831
 The Dealers Act cause of action must be based on a franchise agreement formalized in a written instrument. Stansifer, 487 F.2d at 63. See also 15 U.S.C. § 1221(b), quoted infra at n.12. A nonparty to that agreement cannot be responsible in regard to it merely by virtue of the fact it is a manufacturer and is related to the parties.
 
 
 [12]
 The federal cause of action is created by 15 U.S.C. § 1222:
 An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: Provided, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.
 15 U.S.C. § 1221 provides definitions for the important statutory terms:
 As used in this chapter
 (a) The term "automobile manufacturer" shall mean any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles.
 (b) The term "franchise" shall mean the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract.
 (c) The term "automobile dealer" shall mean any person, partnership, corporation, association, or other form of business enterprise resident in the United States or in any Territory thereof or in the District of Columbia operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons.
 (d) The term "commerce" shall mean commerce among the several States of the United States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or among the Territories or between any Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation.
 (e) The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: Provided, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.
 
 
 [13]
 We discuss first Chrysler Motors' assertion that Marquis' failure to meet MSR justified the franchise termination and then consider the course of dealing between Chrysler Motors and Don Marquis Dodge in light of the statutory duty of good faith
 
 
 [14]
 In support, Chrysler Motors cites: Victory Motors, supra; Clifford Jacobs Motors, Inc. v. Chrysler Corp., 357 F.Supp. 564, 574 (S.D.Ohio 1973); Zebelman v. Chrysler Corp., 299 F.Supp. 653, 658 (E.D.Mo.1968); Sam Goldfarb Plymouth, Inc. v. Chrysler Corp., 214 F.Supp. 600, 602 (E.D.Mich.1962); Thayer Plymouth Center, Inc. v. Chrysler Motors Corp., 255 Cal.App.2d 300, 305-06, 63 Cal.Rptr. 418, 151-52 (1967)
 With the exception of Victory Motors, all the cited cases concern dealers' requests for injunctive relief against threatened franchise termination. As such, their holdings are essentially concerned with the propriety of equitable relief, rather than with the merits of the dealers' claims that the manufacturers violated the Dealers' Act. They do, however, contain dictum characterizing MSR as reasonable.
 One other case cited to us, Miller Plymouth Center, Inc. v. Chrysler Motors Corp., 286 F.Supp. 529 (D.Mass.1968), was reported at the denial of injunction stage, but the final decision was unpublished.
 
 
 [15]
 The fact that Marquis' obligation to meet MSR was a term of the concededly valid franchise agreement does not compel the conclusion that Chrysler Motors was free to rely on that provision to terminate the dealership whenever it chose to do so
 The Dealers' Act was passed to
 (create) a cause of action where none previously existed in that, irrespective of contractual provisions, it grants a right of review in the Federal courts of disputes between automobile manufacturers and their dealers involving the good faith of the manufacturer in complying with, in terminating, or in not renewing the franchises.
 H.Rep., (1956) U.S.Code Cong. & Admin.News at 4596.
 Indeed, the House Committee expressly recognized that the courts' application of contract law concepts in such disputes had in the past prevented granting relief to the dealers. H.Rep., (1956) U.S.Code Cong. & Admin.News at 4598. The Committee's Minority Report strongly disagreed with the legislation, which it felt destroyed freedom of contract in manufacturer-dealer relations. Id. at 4605.
 It is now clear that the Act
 contemplates a cause of action even upon the assertion of legal rights if there is a failure of good faith in the exercise thereof. Assuming issues of fact which would support a finding of lack of "good faith in performing or complying with any of the terms of provisions of the franchise, or in terminating, canceling, or not renewing the franchise," it is up to the jury to determine the redemption value of the facts indicating that the action could have been taken in good faith.
 York Chrysler-Plymouth, 447 F.2d at 791.
 
 
 [16]
 Citing United States v. Chichester, 312 F.2d 275, 282 (9th Cir. 1963), Chrysler Motors argues that an implied waiver of the MSR provision must be demonstrated by "clear, decisive and unequivocal" evidence of a purpose to waive
 The argument misses the mark. We need not determine that the contractual right to terminate for sub-MSR sales was waived before Chrysler Motors' course of conduct in terminating the Agreement can be considered to have been without statutory good faith. It is enough that it invoked the right to terminate without notice after years of acquiescence in the face of low sales.
 Granted, Chrysler Motors did not silently acquiesce. There is substantial evidence, however, that it consistently dealt with Marquis' failure to satisfy MSR as a failure to meet a sales goal and that it stressed to him MSR's relationship to profits rather than that its attainment was a prerequisite to continuing in business. The way in which termination was effected and the justification for it were, in these circumstances, properly considered by the jury in relation to the statutory duty to deal in good faith.
 
 
 [17]
 There was conflicting evidence regarding the net additions to capital made by Marquis, but the question was one for the jury
 
 
 [18]
 The defendants refuted Marquis' assertion that local conditions (freeway construction, liquidation sales by a nearby competitor, expansion of Marquis' sales locality, character of surrounding community) warranted adjustments to MSR
 There was evidence, however, supporting Marquis' contention that Chrysler Motors never intended to make downward adjustments to MSR and the jury reasonably could have believed it.
 
 
 [19]
 Chrysler Motors would have us disregard this theory because it is raised for the first time on appeal. Marquis testified at trial that no one asked him to relocate his dealership. There was in evidence, however, a Chrysler Motors document that linked his resistance to relocation to the decision to terminate his franchise. See n.9 supra. Apparently the document's author considered that there had been enough of a demand made, albeit inexplicitly, to conclude that Marquis would not move
 The memorandum was presented to the jury along with other evidence relating to Marquis' allegations of a coercive and intimidating course of manufacturer conduct.
 
 
 [20]
 Chrysler Motors contends that Marquis' request for review was sent improperly to McCurry when it should have been directed to the Chrysler Motors Review Board. Marquis asserted that he had not yet learned of the board's existence
 Be that as it may, on February 6, 31 days after the notice of termination, McCurry refused Marquis' January 11 request for reconsideration without referring it to the board or earlier informing Marquis that his request should be directed elsewhere. McCurry knew how to reach the board because he later forwarded to it Marquis' March 1 letter (which was then rejected as untimely because filed more than 31 days from the termination notice).
 
 
 [21]
 Dealership terminations were of special concern to Congress because
 (a) terminated dealer frequently is unable to get a franchise from another manufacturer. Since his capital investment is so specialized that it cannot easily be transferred to other kinds of business, termination has often been called an economic death sentence.
 Kessler, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale L.J. 1135, 1149 (1957).
 We recognize that the interests of the manufacturer and the dealer are often at odds, and we have that in mind when we consider the manufacturer's course of conduct in terminating a dealer.
 Manufacturers have high fixed costs and charge dealers standard prices for cars; thus the more cars that are sold to which fixed costs can be allocated, the higher the profit per car. The dealer, on the other hand, may reach a point at which the advertising and sales expenses necessary to sell additional cars will be so increased, and the price at which he can sell these cars will be so decreased, that he will sustain a loss on any subsequent sales.
 Note, Statutory Regulation of Manufacturer-Dealer Relationships in the Automobile Industry, 70 Harv.L.Rev. 1239, 1242 (1957) (footnote omitted).
 In attempting to equalize to some degree the gross disparity in bargaining power between the large automobile manufacturers and their many relatively small, retail dealers, Congress took aim at intimidating conduct relating to enforcement of one-sided contract terms in franchise agreements. See discussion at n.15 supra.
 Although one is under no compulsion initially to become a dealer, once he embarks on the venture he may be faced with terms inserted in the standard franchise agreement solely for the benefit of the manufacturer:
 While a franchise may originate as the product of free bargaining inasmuch as a prospective dealer can stay out of the automobile merchandising business altogether, it becomes a glaring example of a contract of adhesion at the time of renewal when the dealer has invested heavily in the business. Should the franchise be cancelled, or not renewed, the dealer must wind up his business with a great financial loss; he will also lose whatever benefits of good will he has gained. To say that the dealer's lack of protection is due to the absence of clauses "they themselves have failed to insert" is, therefore, unrealistic.
 Kessler, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale L.J. 1135, 1156 (1957).
 The MSR provision of Marquis' franchise potentially became such a vehicle for oppressive manufacturer conduct. He established his business and invested heavily, but his sales remained below MSR. Although Chrysler Motors could have enforced the provision from the outset, or at least put him on notice as to the immediate terminability of his franchise, it chose not to do so. It signed franchise agreements with the MSR term both in 1961 and 1963, although Marquis' inability to meet MSR was by then apparent.
 In addition, Chrysler Motors expanded Marquis' sales area several times, thereby increasing his dealership's MSR. This, too, occurred during the period of prolonged sub-MSR sales, and further continued the course of conduct that treated MSR as a goal rather than as a strict sales quota.
 
 
 [22]
 The cases have uniformly held that evidence of coercion or intimidation is necessary to a showing of lack of good faith under the statute, and a mere showing of arbitrary or other bad faith conduct absent coercion is not a sufficient ground for recovery under the Act
 Overseas Motors, Inc., 519 F.2d at 125. See text following n.13 supra.
 Chrysler Motors contends that the court's instructions obfuscated the necessity of such a finding.
 
 
 [23]
 Authorities cited by Chrysler Motors are unconvincing. Unlike Evanston Motor Co., 436 F.Supp. at 1375-76, Marquis' complaint was based on a dealership termination that took place within the three-year limitation period. See text accompanying n. 10 supra
 The prospectus was relevant to the course of conduct leading to termination. In Evanston Motors, the court held a claim based on an allegedly fraudulent misrepresentation to be time-barred when it was obvious from the complaint that the representation, as well as plaintiff's discovery of its character, occurred more than three years before suit was filed.
 Smith-Johnson Motor Corp. v. Hoffman Motors, 411 F.Supp. at 674, is also inapposite. Marquis based his claim on a breach of good faith in the termination of his written franchise rather than on a failure to honor "oral representations or promises, not part of the written franchise agreement."
 
 
 [24]
 Chrysler Motors argues that Marquis was responsible for the destruction of documents relevant to the damage issue and that his evidence of damage must be viewed critically. Although the basic proposition is correct, it is urged in the wrong forum. Inferences from the evidence, adverse or otherwise, are properly argued to the finder of fact, rather than to the reviewing court. We conclude that the jury considered the argument but nonetheless found in favor of Marquis
 
 
 [25]
 In Santa Clara Valley Distributing Co., supra, the panel clearly explained why the Poller admonition relates only to pretrial dispositions, such as summary judgments or dismissals for failure to state a claim, rather than to directed verdicts which are entered "after the plaintiffs presumably have had a full opportunity for discovery and presentation of their case." 556 F.2d at 944 n. 1. Rather than repeat that panel's careful analysis of the authority in this area, we refer the reader to it
 
 
 [26]
 Proscribed "arrangements restraining trade" include such practices as "refusals to deal to eliminate price-cutting dealers, . . . to keep new competition out of a market, . . . to enforce a tying arrangement, . . . to create a monopoly in a product market, . . . or to further strengthen an already dominant market position." Bushie v. Stenocord Corp., 460 F.2d at 119 (citations omitted). See also Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d at 76
 
 
 [27]
 Although Marquis was afforded full opportunity to support his allegations, he offered nothing to show that the defendants' actions restrained trade
 The defendants showed, among other things, that by the time of trial most of D.E. outlets established in the East Bay District had been, or were in the process of being, turned over to independent dealer-owners.
 Marquis alleged that he was harmed by unprofitable D.E. dealerships whose losses were subsidized by favorable financing arranged among the defendants. He was unable to substantiate the allegations in any way, however, or to show that the D.E. outlets deliberately engaged in predatory conduct. The dual distribution system employed to market Dodge products does not in itself violate the antitrust laws. See England v. Chrysler Corp., 493 F.2d 269, 273-74 (9th Cir.), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).
 
 
 [28]
 Even those advocating broadened Sherman Act protection to franchise terminations recognize that "a single franchise termination is unlikely to demonstrably affect efficiency or competitive intensity in the distribution of goods" and agree that § 1 liability should not be imposed where, as here, the franchisor "demonstrate(s) convincing benefits flowing to (its) business or to the public as a direct result of any termination that destroys a franchisee's business." Bohling, Franchise Terminations Under the Sherman Act: Populism and Relational Power, 53 Tex.L.Rev. 1180, 1186, 1208 (1975) (footnotes omitted). "The antitrust goal of efficiency, and the legitimate underlying bases of the right to refuse to deal and the public utility objection all compel this result." Id. at 1206
 
 
 [29]
 In light of our conclusion that the Sherman Act claims were properly rejected, we need not address Chrysler Financial's argument that it should not have been joined as a party defendant